RASUL ET AL. *v.* BUSH, PRESIDENT OF THE
UNITED STATES, ET AL.

No. 03–334. Argued April 20, 2004—Decided June 28, 2004*

---

*Together with No. 03–343, *Al Odah et al.* v. *United States et al.*, also on certiorari to the same court.

*John J. Gibbons* argued the cause for petitioners in both cases. With him on the briefs for petitioner Rasul et al. in No. 03–334 were *Joseph Margulies, Barbara J. Olshansky,* and *Michael Ratner. Thomas B. Wilner, Neil H. Koslowe,* and *Kristine A. Huskey* filed briefs for petitioner Al Odah et al. in both cases.

*Solicitor General Olson* argued the cause for respondents in both cases. With him on the brief were *Assistant Attorney General Keisler, Deputy Solicitor General Clement, Deputy Assistant Attorney General Katsas, Gregory G. Garre, Douglas N. Letter, Robert M. Loeb, Sharon Swingle,* and *William H. Taft IV.*†

†Briefs of *amici curiae* urging reversal in both cases were filed for Hungarian Jews et al. by *Steve W. Berman, R. Brent Walton, Jonathan W. Cuneo, David W. Stanley, Michael Waldman,* and *Samuel J. Dubbin;* for the International Commission of Jurists et al. by *William J. Butler* and *A. Hays Butler;* for the National Institute of Military Justice by *Ronald W. Meister;* for Abdullah Al-Joaid by *Mary Patricia Michel;* for Diego C. Asencio et al. by *William M. Hannay;* for David M. Brahms et al. by *James C. Schroeder;* for the Honorable John H. Dalton et al. by *Harold Hongju Koh, Gerald L. Neuman, Phillip H. Rudolph,* and *Daniel Feldman;* for Leslie H. Jackson et al. by *Thomas F. Cullen, Jr.,* and *Christian G. Vergonis;* for the Honorable Nathaniel R. Jones et al. by *David J. Bradford;* for Omar Ahmed Khadr by *John A. E. Pottow;* and for Fred Korematsu by *Stephen J. Schulhofer, Evan R. Chesler, Dale Minami,* and *Eric K. Yamamoto.*

Briefs of *amici curiae* urging affirmance in both cases were filed for the State of Alabama et al. by *John J. Park, Jr.,* Assistant Attorney General of Alabama, *Richard F. Allen,* Acting Attorney General of Alabama, and *Kevin Newsom,* Solicitor General, and by the Attorneys General for their respective States as follows: *Jim Petro* of Ohio, *Greg Abbott* of Texas, and *Jerry W. Kilgore* of Virginia; for the Honorable Bill Owens, Governor of Colorado, et al. by *Richard A. Westfall* and *Allan L. Hale;* for the American Center for Law & Justice et al. by *Jay Alan Sekulow, Thomas P. Monaghan, Stuart J. Roth, Colby M. May, James M. Henderson, Sr., Joel H. Thornton,* and *Robert W. Ash;* for Citizens for the Common Defence by *Carter G. Phillips;* for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Richard A. Samp;* for Professor Kenneth Anderson et al. by *David B. Rivkin, Jr., Lee A. Casey, Darin R. Bartram, Ruth Wedgwood, Charles Fried,* and *Max Kampelman;* and for the Honorable William P. Barr et al. by *Andrew G. McBride.*

Briefs of *amici curiae* were filed in both cases for the Bipartisan Coalition of National and International Non-Governmental Organizations by *Jonathan M. Freiman;* for the Center for Justice and Accountability et al. by *Nicholas W. Van Aelstyn, Warrington S. Parker III, Thomas P. Brown, Christian E. Mammen,* and *Elizabeth A. Brown;* for the Commonwealth Lawyers Association by *Stephen J. Pollak* and *John Townsend Rich;* for the Human Rights Institute of the International Bar Association

JUSTICE STEVENS delivered the opinion of the Court.

These two cases present the narrow but important question whether United States courts lack jurisdiction to consider challenges to the legality of the detention of foreign nationals captured abroad in connection with hostilities and incarcerated at the Guantanamo Bay Naval Base, Cuba.

I

On September 11, 2001, agents of the al Qaeda terrorist network hijacked four commercial airliners and used them as missiles to attack American targets. While one of the four attacks was foiled by the heroism of the plane's passengers, the other three killed approximately 3,000 innocent civilians, destroyed hundreds of millions of dollars of property, and severely damaged the U. S. economy. In response to the attacks, Congress passed a joint resolution authorizing the President to use "all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks . . . or harbored such organizations or persons." Authorization for Use of Military Force, Pub. L. 107–40, §§ 1–2, 115 Stat. 224. Acting pursuant to that authorization, the President sent U. S. Armed Forces into Afghanistan to wage a military campaign against al Qaeda and the Taliban regime that had supported it.

Petitioners in these cases are 2 Australian citizens and 12 Kuwaiti citizens who were captured abroad during hostilities

by *Pamela Rogers Chepiga;* for International Law Expert by *James R. Klimaski;* for Sir J. H. Baker et al. by *James Oldham* and *Michael J. Wishnie;* for Professor John H. Barton et al. by *Mr. Barton, pro se,* and *Barry E. Carter;* and for 175 Members of Both Houses of the Parliament of the United Kingdom of Great Britain and Northern Ireland by *Edwin S. Matthews, Jr.,* and *Edward H. Tillinghast III.*

A brief of *amicus curiae* was filed in No. 03–343 for Military Attorneys Assigned to the Defense in the Office of Military Commissions by *Neal Katyal, Sharon A. Shaffer, Philip Sundel, Mark A. Bridges,* and *Michael D. Mori.*

between the United States and the Taliban.[1] Since early 2002, the U. S. military has held them—along with, according to the Government's estimate, approximately 640 other non-Americans captured abroad—at the naval base at Guantanamo Bay. Brief for Respondents 6. The United States occupies the base, which comprises 45 square miles of land and water along the southeast coast of Cuba, pursuant to a 1903 Lease Agreement executed with the newly independent Republic of Cuba in the aftermath of the Spanish-American War. Under the agreement, "the United States recognizes the continuance of the ultimate sovereignty of the Republic of Cuba over the [leased areas]," while "the Republic of Cuba consents that during the period of the occupation by the United States . . . the United States shall exercise complete jurisdiction and control over and within said areas."[2] In 1934, the parties entered into a treaty providing that, absent an agreement to modify or abrogate the lease, the lease would remain in effect "[s]o long as the United States of America shall not abandon the . . . naval station of Guantanamo."[3]

In 2002, petitioners, through relatives acting as their next friends, filed various actions in the U. S. District Court for the District of Columbia challenging the legality of their detention at the base. All alleged that none of the petitioners has ever been a combatant against the United States or has

---

[1] When we granted certiorari, the petitioners also included two British citizens, Shafiq Rasul and Asif Iqbal. These petitioners have since been released from custody.

[2] Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U. S.-Cuba, Art. III, T. S. No. 418 (hereinafter 1903 Lease Agreement). A supplemental lease agreement, executed in July 1903, obligates the United States to pay an annual rent in the amount of "two thousand dollars, in gold coin of the United States," and to maintain "permanent fences" around the base. Lease of Certain Areas for Naval or Coaling Stations, July 2, 1903, U. S.-Cuba, Arts. I–II, T. S. No. 426.

[3] Treaty Defining Relations with Cuba, May 29, 1934, U. S.-Cuba, Art. III, 48 Stat. 1683, T. S. No. 866 (hereinafter 1934 Treaty).

ever engaged in any terrorist acts.[4] They also alleged that none has been charged with any wrongdoing, permitted to consult with counsel, or provided access to the courts or any other tribunal. App. 29, 77, 108.[5]

The two Australians, Mamdouh Habib and David Hicks, each filed a petition for writ of habeas corpus, seeking release from custody, access to counsel, freedom from interrogations, and other relief. *Id.*, at 98–99, 124–126. Fawzi Khalid Abdullah Fahad Al Odah and the 11 other Kuwaiti detainees filed a complaint seeking to be informed of the charges against them, to be allowed to meet with their families and with counsel, and to have access to the courts or some other impartial tribunal. *Id.*, at 34. They claimed that denial of these rights violates the Constitution, international law, and treaties of the United States. Invoking the court's jurisdiction under 28 U. S. C. §§ 1331 and 1350, among other statutory bases, they asserted causes of action under the Administrative Procedure Act, 5 U. S. C. §§ 555, 702, 706; the Alien Tort Statute, 28 U. S. C. § 1350; and the general federal habeas corpus statute, §§ 2241–2243. App. 19.

Construing all three actions as petitions for writs of habeas corpus, the District Court dismissed them for want of jurisdiction. The court held, in reliance on our opinion in *Johnson* v. *Eisentrager*, 339 U. S. 763 (1950), that "aliens detained outside the sovereign territory of the United States

---

[4] Relatives of the Kuwaiti detainees allege that the detainees were taken captive "by local villagers seeking promised bounties or other financial rewards" while they were providing humanitarian aid in Afghanistan and Pakistan, and were subsequently turned over to U. S. custody. App. 24–25. The Australian David Hicks was allegedly captured in Afghanistan by the Northern Alliance, a coalition of Afghan groups opposed to the Taliban, before he was turned over to the United States. *Id.*, at 84. The Australian Mamdouh Habib was allegedly arrested in Pakistan by Pakistani authorities and turned over to Egyptian authorities, who in turn transferred him to U. S. custody. *Id.*, at 110–111.

[5] David Hicks has since been permitted to meet with counsel. Brief for Respondents 9.

[may not] invok[e] a petition for a writ of habeas corpus."
215 F. Supp. 2d 55, 68 (DC 2002). . The Court of Appeals
affirmed.   Reading *Eisentrager* to hold that "'the privilege
of litigation' does not extend to aliens in military custody
who have no presence in 'any territory over which the
United States is sovereign,'" 321 F. 3d 1134, 1144 (CADC
2003) (quoting *Eisentrager,* 339 U. S., at 777–778), it held that
the District Court lacked jurisdiction over petitioners' ha-
beas· actions, as well as their remaining federal statutory
claims that do not sound in habeas.   We granted certiorari,
540 U. S. 1003 (2003), and now reverse.

## II

Congress has granted federal district courts, "within their
respective jurisdictions," the authority to hear applications
for habeas corpus by any person who claims to be held "in
custody in violation of the Constitution or laws or treaties of
the United States."   28 U. S. C. §§ 2241(a), (c)(3).   The stat-
ute traces its ancestry to the first grant of federal-court ju-
risdiction: Section 14 of the Judiciary Act of 1789 authorized
federal courts to issue the writ of habeas corpus to prisoners
who are "in custody, under or by colour of the authority of
the United States, or are committed for trial before some
court of the same."   Act of Sept. 24, 1789, ch. 20, § 14, 1 Stat.
82.   In 1867, Congress extended the protections of the writ
to "all cases where any person may be restrained of his or
her liberty in violation of the constitution, or of any treaty
or law of the United States."   Act of Feb. 5, 1867, ch. 28, 14
Stat. 385.   See *Felker* v. *Turpin,* 518 U. S. 651, 659–660
(1996).

Habeas corpus is, however, "a writ antecedent to
statute, . . . throwing its root deep into the genius of our
common law."   *Williams* v. *Kaiser,* 323 U. S. 471, 484, n. 2
(1945) (internal quotation marks omitted).   The writ ap-
peared in English law several centuries ago, became "an
integral part of our common-law heritage" by the time the

Colonies achieved independence, *Preiser* v. *Rodriguez*, 411 U. S. 475, 485 (1973), and received explicit recognition in the Constitution, which forbids suspension of "[t]he Privilege of the Writ of Habeas Corpus . . . unless when in Cases of Rebellion or Invasion the public Safety may require it," Art. I, § 9, cl. 2.

As it has evolved over the past two centuries, the habeas statute clearly has expanded habeas corpus "beyond the limits that obtained during the 17th and 18th centuries." *Swain* v. *Pressley*, 430 U. S. 372, 380, n. 13 (1977). But "[a]t its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *INS* v. *St. Cyr*, 533 U. S. 289, 301 (2001). See also *Brown* v. *Allen*, 344 U. S. 443, 533 (1953) (Jackson, J., concurring in result) ("The historic purpose of the writ has been to relieve detention by executive authorities without judicial trial"). As Justice Jackson wrote in an opinion respecting the availability of habeas corpus to aliens held in U. S. custody:

> "Executive imprisonment has been considered oppressive and lawless since John, at Runnymede, pledged that no free man should be imprisoned, dispossessed, outlawed, or exiled save by the judgment of his peers or by the law of the land. The judges of England developed the writ of habeas corpus largely to preserve these immunities from executive restraint." *Shaughnessy* v. *United States ex rel. Mezei*, 345 U. S. 206, 218–219 (1953) (dissenting opinion).

Consistent with the historic purpose of the writ, this Court has recognized the federal courts' power to review applications for habeas relief in a wide variety of cases involving executive detention, in wartime as well as in times of peace. The Court has, for example, entertained the habeas petitions of an American citizen who plotted an attack on military installations during the Civil War, *Ex parte*

*Milligan*, 4 Wall. 2 (1866), and of admitted enemy aliens convicted of war crimes during a declared war and held in the United States, *Ex parte Quirin*, 317 U. S. 1 (1942), and its insular possessions, *In re Yamashita*, 327 U. S. 1 (1946).

The question now before us is whether the habeas statute confers a right to judicial review of the legality of executive detention of aliens in a territory over which the United States exercises plenary and exclusive jurisdiction, but not "ultimate sovereignty." [6]

### III

Respondents' primary submission is that the answer to the jurisdictional question is controlled by our decision in *Eisentrager*. In that case, we held that a Federal District Court lacked authority to issue a writ of habeas corpus to 21 German citizens who had been captured by U. S. forces in China, tried and convicted of war crimes by an American military commission headquartered in Nanking, and incarcerated in the Landsberg Prison in occupied Germany. The Court of Appeals in *Eisentrager* had found jurisdiction, reasoning that "any person who is deprived of his liberty by officials of the United States, acting under purported authority of that Government, and who can show that his confinement is in violation of a prohibition of the Constitution, has a right to the writ." *Eisentrager* v. *Forrestal*, 174 F. 2d 961, 963 (CADC 1949). In reversing that determination, this Court summarized the six critical facts in the case:

> "We are here confronted with a decision whose basic premise is that these prisoners are entitled, as a constitutional right, to sue in some court of the United States for a writ of *habeas corpus*. To support that assumption we must hold that a prisoner of our military authorities is constitutionally entitled to the writ, even though he (a) is an enemy alien; (b) has never been or resided in the United States; (c) was captured outside of our ter-

---

[6] 1903 Lease Agreement, Art. III.

ritory and there held in military custody as a prisoner of war; (d) was tried and convicted by a Military Commission sitting outside the United States; (e) for offenses against laws of war committed outside the United States; (f) and is at all times imprisoned outside the United States." 339 U. S., at 777.

On this set of facts, the Court concluded, "no right to the writ of *habeas corpus* appears." *Id.*, at 781.

Petitioners in these cases differ from the *Eisentrager* detainees in important respects: They are not nationals of countries at war with the United States, and they deny that they have engaged in or plotted acts of aggression against the United States; they have never been afforded access to any tribunal, much less charged with and convicted of wrongdoing; and for more than two years they have been imprisoned in territory over which the United States exercises exclusive jurisdiction and control.

Not only are petitioners differently situated from the *Eisentrager* detainees, but the Court in *Eisentrager* made quite clear that all six of the facts critical to its disposition were relevant only to the question of the prisoners' *constitutional* entitlement to habeas corpus. *Id.*, at 777. The Court had far less to say on the question of the petitioners' *statutory* entitlement to habeas review. Its only statement on the subject was a passing reference to the absence of statutory authorization: "Nothing in the text of the Constitution extends such a right, nor does anything in our statutes." *Id.*, at 768.

Reference to the historical context in which *Eisentrager* was decided explains why the opinion devoted so little attention to the question of statutory jurisdiction. In 1948, just two months after the *Eisentrager* petitioners filed their petition for habeas corpus in the U. S. District Court for the District of Columbia, this Court issued its decision in *Ahrens* v. *Clark*, 335 U. S. 188, a case concerning the application of the habeas statute to the petitions of 120 Germans who were

then being detained at Ellis Island, New York, for deportation to Germany. The *Ahrens* detainees had also filed their petitions in the U. S. District Court for the District of Columbia, naming the Attorney General as the respondent. Reading the phrase "within their respective jurisdictions" as used in the habeas statute to require the petitioners' presence within the district court's territorial jurisdiction, the Court held that the District of Columbia court lacked jurisdiction to entertain the detainees' claims. *Id.*, at 192. *Ahrens* expressly reserved the question "of what process, if any, a person confined in an area not subject to the jurisdiction of any district court may employ to assert federal rights." *Id.*, at 192, n. 4. But as the dissent noted, if the presence of the petitioner in the territorial jurisdiction of a federal district court were truly a jurisdictional requirement, there could be only one response to that question. *Id.*, at 209 (opinion of Rutledge, J.).[7]

When the District Court for the District of Columbia reviewed the German prisoners' habeas application in *Eisentrager*, it thus dismissed their action on the authority of *Ahrens*. See *Eisentrager*, 339 U. S., at 767, 790. Although the Court of Appeals reversed the District Court, it implicitly conceded that the District Court lacked jurisdiction under the habeas statute as it had been interpreted in *Ahrens*. The Court of Appeals instead held that petitioners had a constitutional right to habeas corpus secured by the Suspension Clause, U. S. Const., Art. I, § 9, cl. 2, reasoning that "if a person has a right to a writ of habeas corpus, he cannot be deprived of the privilege by an omission in a fed-

---

[7] Justice Rutledge wrote:

"[I]f absence of the body detained from the territorial jurisdiction of the court having jurisdiction of the jailer creates a total and irremediable void in the court's capacity to act, . . . then it is hard to see how that gap can be filled by such extraneous considerations as whether there is no other court in the place of detention from which remedy might be had . . . ." 335 U. S., at 209.

eral jurisdictional statute." *Eisentrager* v. *Forrestal*, 174 F. 2d, at 965. In essence, the Court of Appeals concluded that the habeas statute, as construed in *Ahrens*, had created an unconstitutional gap that had to be filled by reference to "fundamentals." 174 F. 2d, at 963. In its review of that decision, this Court, like the Court of Appeals, proceeded from the premise that "nothing in our statutes" conferred federal-court jurisdiction, and accordingly evaluated the Court of Appeals' resort to "fundamentals" on its own terms. 339 U. S., at 768.[8]

Because subsequent decisions of this Court have filled the statutory gap that had occasioned *Eisentrager*'s resort to "fundamentals," persons detained outside the territorial jurisdiction of any federal district court no longer need rely on the Constitution as the source of their right to federal habeas review. In *Braden* v. *30th Judicial Circuit Court of Ky.*, 410 U. S. 484, 495 (1973), this Court held, contrary to *Ahrens*, that the prisoner's presence within the territorial jurisdiction of the district court is not "an invariable prerequisite" to the exercise of district court jurisdiction under the federal habeas statute. Rather, because "the writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody," a district court acts "within [its] respective jurisdiction" within the meaning of § 2241 as long as "the custodian

---

[8] Although JUSTICE SCALIA disputes the basis for the Court of Appeals' holding, *post*, at 491 (dissenting opinion), what is most pertinent for present purposes is that this Court clearly understood the Court of Appeals' decision to rest on constitutional and not statutory grounds. *Eisentrager*, 339 U. S., at 767 ("[The Court of Appeals] concluded that any person, including an enemy alien, deprived of his liberty anywhere under any purported authority of the United States is entitled to the writ if he can show that extension to his case of any constitutional rights or limitations would show his imprisonment illegal; [and] that, *although no statutory jurisdiction of such cases is given*, courts must be held to possess it as part of the judicial power of the United States . . ." (emphasis added)).

can be reached by service of process." 410 U. S., at 494–495. *Braden* reasoned that its departure from the rule of *Ahrens* was warranted in light of developments that "had a profound impact on the continuing vitality of that decision." 410 U. S., at 497. These developments included, notably, decisions of this Court in cases involving habeas petitioners "confined overseas (and thus outside the territory of any district court)," in which the Court "held, if only implicitly, that the petitioners' absence from the district does not present a jurisdictional obstacle to the consideration of the claim." *Id.*, at 498 (citing *Burns* v. *Wilson*, 346 U. S. 137 (1953), rehearing denied, 346 U. S. 844, 851–852 (opinion of Frankfurter, J.); *United States ex rel. Toth* v. *Quarles*, 350 U. S. 11 (1955); *Hirota* v. *MacArthur*, 338 U. S. 197, 199 (1948) (Douglas, J., concurring (1949))). *Braden* thus established that *Ahrens* can no longer be viewed as establishing "an inflexible jurisdictional rule," and is strictly relevant only to the question of the appropriate forum, not to whether the claim can be heard at all. 410 U. S., at 499–500.

Because *Braden* overruled the statutory predicate to *Eisentrager*'s holding, *Eisentrager* plainly does not preclude the exercise of § 2241 jurisdiction over petitioners' claims.[9]

---

[9] The dissent argues that *Braden* did not overrule *Ahrens'* jurisdictional holding, but simply distinguished it. *Post*, at 494–495. Of course, *Braden* itself indicated otherwise, 410 U. S., at 495–500, and a long line of judicial and scholarly interpretations, beginning with then-JUSTICE REHNQUIST's dissenting opinion, have so understood the decision. See, *e. g., id.*, at 502 ("Today the Court overrules *Ahrens*"); *Moore* v. *Olson*, 368 F. 3d 757, 758 (CA7 2004) ("[A]fter *Braden* . . . , which overruled *Ahrens*, the location of a collateral attack is best understood as a matter of venue"); *Armentero* v. *INS*, 340 F. 3d 1058, 1063 (CA9 2003) ("[T]he Court in *[Braden]* declared that *Ahrens* was overruled"); *Henderson* v. *INS*, 157 F. 3d 106, 126, n. 20 (CA2 1998) ("On the issue of territorial jurisdiction, *Ahrens* was subsequently overruled by *Braden*"); *Chatman-Bey* v. *Thornburgh*, 864 F. 2d 804, 811 (CADC 1988) (en banc) ("[I]n *Braden*, the Court cut back substantially on *Ahrens* (and indeed overruled its territorially-based jurisdictional

## IV

Putting *Eisentrager* and *Ahrens* to one side, respondents contend that we can discern a limit on § 2241 through application of the "longstanding principle of American law" that congressional legislation is presumed not to have extraterritorial application unless such intent is clearly manifested. *EEOC* v. *Arabian American Oil Co.,* 499 U. S. 244, 248 (1991). Whatever traction the presumption against extraterritoriality might have in other contexts, it certainly has no application to the operation of the habeas statute with respect to persons detained within "the territorial jurisdiction" of the United States. *Foley Bros., Inc.* v. *Filardo,* 336 U. S. 281, 285 (1949). By the express terms of its agreements with Cuba, the United States exercises "complete jurisdiction and control" over the Guantanamo Bay Naval Base, and may continue to exercise such control permanently if it so chooses. 1903 Lease Agreement, Art. III; 1934

holding)"). See also, *e. g., Patterson* v. *McLean Credit Union,* 485 U. S. 617, 618 (1988) *(per curiam);* Eskridge, Overruling Statutory Precedents, 76 Geo. L. J. 1361, App. A (1988).

The dissent also disingenuously contends that the continuing vitality of *Ahrens'* jurisdictional holding is irrelevant to the question presented in these cases, "inasmuch as *Ahrens* did not pass upon any of the statutory issues decided by *Eisentrager." Post,* at 494. But what JUSTICE SCALIA describes as *Eisentrager's* statutory holding—"that, unaided by the canon of constitutional avoidance, the statute did not confer jurisdiction over an alien detained outside the territorial jurisdiction of the courts of the United States," *post,* at 493—is little more than the rule of *Ahrens* cloaked in the garb of *Eisentrager's* facts. To contend plausibly that this holding survived *Braden,* JUSTICE SCALIA at a minimum must find a textual basis for the rule other than the phrase "within their respective jurisdictions"— a phrase which, after *Braden,* can no longer be read to require the habeas petitioner's physical presence within the territorial jurisdiction of a federal district court. Two references to the district of confinement in provisions relating to recordkeeping and pleading requirements in proceedings before circuit judges hardly suffice in that regard. See *post,* at 489–490 (citing 28 U. S. C. §§ 2241(a), 2242).

Treaty, Art. III. Respondents themselves concede that the habeas statute would create federal-court jurisdiction over the claims of an American citizen held at the base. Tr. of Oral Arg. 27. Considering that the statute draws no distinction between Americans and aliens held in federal custody, there is little reason to think that Congress intended the geographical coverage of the statute to vary depending on the detainee's citizenship.[10] Aliens held at the base, no less than American citizens, are entitled to invoke the federal courts' authority under § 2241.

Application of the habeas statute to persons detained at the base is consistent with the historical reach of the writ of habeas corpus. At common law, courts exercised habeas jurisdiction over the claims of aliens detained within sovereign territory of the realm,[11] as well as the claims of persons

---

[10] JUSTICE SCALIA appears to agree that neither the plain text of the statute nor his interpretation of that text provides a basis for treating American citizens differently from aliens. *Post,* at 497. But resisting the practical consequences of his position, he suggests that he might nevertheless recognize an "atextual exception" to his statutory rule for citizens held beyond the territorial jurisdiction of the federal district courts. *Ibid.*

[11] See, *e. g., King* v. *Schiever,* 2 Burr. 765, 97 Eng. Rep. 551 (K. B. 1759) (reviewing the habeas petition of a neutral alien deemed a prisoner of war because he was captured aboard an enemy French privateer during a war between England and France); *Sommersett* v. *Stewart,* 20 How. St. Tr. 1, 79–82 (K. B. 1772) (releasing on habeas an African slave purchased in Virginia and detained on a ship docked in England and bound for Jamaica); *Case of the Hottentot Venus,* 13 East 195, 104 Eng. Rep. 344 (K. B. 1810) (reviewing the habeas petition of a "native of *South Africa*" allegedly held in private custody).

American courts followed a similar practice in the early years of the Republic. See, *e. g., United States* v. *Villato,* 2 Dall. 370 (CC Pa. 1797) (granting habeas relief to Spanish-born prisoner charged with treason on the ground that he had never become a citizen of the United States); *Ex parte D'Olivera,* 7 F. Cas. 853 (No. 3,967) (CC Mass. 1813) (Story, J., on circuit) (ordering the release of Portuguese sailors arrested for deserting their ship); *Wilson* v. *Izard,* 30 F. Cas. 131 (No. 17,810) (CC NY 1815)

detained in the so-called "exempt jurisdictions," where ordinary writs did not run,[12] and all other dominions under the sovereign's control.[13] As Lord Mansfield wrote in 1759, even if a territory was "no part of the realm," there was "no doubt" as to the court's power to issue writs of habeas corpus if the territory was "under the subjection of the Crown." *King* v. *Cowle*, 2 Burr. 834, 854–855, 97 Eng. Rep. 587, 598–599 (K. B.). Later cases confirmed that the reach of the writ depended not on formal notions of territorial sovereignty, but rather on the practical question of "the exact extent and nature of the jurisdiction or dominion exercised in fact by the Crown." *Ex parte Mwenya*, [1960] 1 Q. B. 241, 303 (C. A.) (Lord Evershed, M. R.).[14]

---

(Livingston, J., on circuit) (reviewing the habeas petition of enlistees who claimed that they were entitled to discharge because of their status as enemy aliens).

[12] See, *e. g.*, *Bourn's Case*, Cro. Jac. 543, 79 Eng. Rep. 465 (K. B. 1619) (writ issued to the Cinque-Ports town of Dover); *Alder* v. *Puisy*, 1 Freem. 12, 89 Eng. Rep. 10 (K. B. 1671) (same); *Jobson's Case*, Latch 160, 82 Eng. Rep. 325 (K. B. 1626) (entertaining the habeas petition of a prisoner held in the County Palatine of Durham). See also 3 W. Blackstone, Commentaries on the Laws of England 79 (1769) (hereinafter Blackstone) ("[A]ll prerogative writs (as those of *habeas corpus*, prohibition, *certiorari*, and *mandamus*) may issue . . . to all these exempt jurisdictions; because the privilege, that the king's writ runs not, must be intended between party and party, for there can be no such privilege against the king" (footnotes omitted)); R. Sharpe, Law of Habeas Corpus 188–189 (2d ed. 1989) (describing the "extraordinary territorial ambit" of the writ at common law).

[13] See, *e. g.*, *King* v. *Overton*, 1 Sid. 387, 82 Eng. Rep. 1173 (K. B. 1668) (writ issued to Isle of Jersey); *King* v. *Salmon*, 2 Keb. 450, 84 Eng. Rep. 282 (K. B. 1669) (same). See also 3 Blackstone 131 (habeas corpus "run[s] into all parts of the king's dominions: for the king is at all times [e]ntitled to have an account, why the liberty of any of his subjects is restrained, wherever that restraint may be inflicted" (footnote omitted)); M. Hale, History of the Common Law 120–121 (C. Gray ed. 1971) (writ of habeas corpus runs to the Channel Islands, even though "they are not Parcel of the Realm of England").

[14] *Ex parte Mwenya* held that the writ ran to a territory described as a "foreign country within which [the Crown] ha[d] power and jurisdiction by treaty, grant, usage, sufferance, and other lawful means." 1 Q. B., at 265

In the end, the answer to the question presented is clear. Petitioners contend that they are being held in federal custody in violation of the laws of the United States.[15] No party questions the District Court's jurisdiction over petitioners' custodians. Cf. *Braden*, 410 U. S., at 495. Section

---

(Parker, C. J.) (internal quotation marks omitted). See also *King* v. *The Earl of Crewe ex parte Sekgome*, [1910] 2 K. B. 576, 606 (C. A.) (Williams, L. J.) (concluding that the writ would run to such a territory); *id.*, at 618 (Farwell, L. J.) (same). As Lord Justice Sellers explained:

"Lord Mansfield gave the writ the greatest breadth of application which in the then circumstances could well be conceived. . . . 'Subjection' is fully appropriate to the powers exercised or exercisable by this country irrespective of territorial sovereignty or dominion, and it embraces in outlook the power of the Crown in the place concerned." 1 Q. B., at 310.

JUSTICE SCALIA cites *In re Ning Yi-Ching*, 56 T. L. R. 3 (K. B. Vac. Ct. 1939), for the broad proposition that habeas corpus has been categorically unavailable to aliens held outside sovereign territory. *Post*, at 504. *Ex parte Mwenya*, however, casts considerable doubt on this narrow view of the territorial reach of the writ. 1 Q. B., at 295 (Lord Evershed, M. R.) (noting that *In re Ning Yi-Ching* relied on Lord Justice Kennedy's opinion in *Ex parte Sekgome* concerning the territorial reach of the writ, despite the opinions of two members of the court who "took a different view upon this matter"). And *In re Ning Yi-Ching* itself made quite clear that "the remedy of *habeas corpus* was not confined to British subjects," but would extend to "any person . . . detained" within reach of the writ. 56 T. L. R., at 5 (citing *Ex parte Sekgome*, 2 K. B., at 620 (Kennedy, L. J.)). Moreover, the result in that case can be explained by the peculiar nature of British control over the area where the petitioners, four Chinese nationals accused of various criminal offenses, were being held pending transfer to the local district court. Although the treaties governing the British Concession at Tientsin did confer on Britain "certain rights of administration and control," "the right to administer justice" to Chinese nationals was not among them. 56 T. L. R., at 4–6.

[15] Petitioners' allegations—that, although they have engaged neither in combat nor in acts of terrorism against the United States, they have been held in executive detention for more than two years in territory subject to the long-term, exclusive jurisdiction and control of the United States, without access to counsel and without being charged with any wrongdoing—unquestionably describe "custody in violation of the Constitution or laws or treaties of the United States." 28 U. S. C. § 2241(c)(3). Cf. *United States* v. *Verdugo-Urquidez*, 494 U. S. 259, 277–278 (1990) (KENNEDY, J., concurring), and cases cited therein.

2241, by its terms, requires nothing more. We therefore hold that § 2241 confers on the District Court jurisdiction to hear petitioners' habeas corpus challenges to the legality of their detention at the Guantanamo Bay Naval Base.

## V

In addition to invoking the District Court's jurisdiction under § 2241, the Al Odah petitioners' complaint invoked the court's jurisdiction under 28 U. S. C. § 1331, the federal-question statute, as well as § 1350, the Alien Tort Statute. The Court of Appeals, again relying on *Eisentrager,* held that the District Court correctly dismissed the claims founded on § 1331 and § 1350 for lack of jurisdiction, even to the extent that these claims "deal only with conditions of confinement and do not sound in habeas," because petitioners lack the "privilege of litigation" in U. S. courts. 321 F. 3d, at 1144 (internal quotation marks omitted). Specifically, the court held that because petitioners' § 1331 and § 1350 claims "necessarily rest on alleged violations of the same category of laws listed in the habeas corpus statute," they, like claims founded on the habeas statute itself, must be "beyond the jurisdiction of the federal courts." *Id.,* at 1144–1145.

As explained above, *Eisentrager* itself erects no bar to the exercise of federal-court jurisdiction over the petitioners' habeas corpus claims. It therefore certainly does not bar the exercise of federal-court jurisdiction over claims that merely implicate the "same category of laws listed in the habeas corpus statute." But in any event, nothing in *Eisentrager* or in any of our other cases categorically excludes aliens detained in military custody outside the United States from the "'privilege of litigation'" in U. S. courts. 321 F. 3d, at 1139. The courts of the United States have traditionally been open to nonresident aliens. Cf. *Disconto Gesellschaft* v. *Umbreit,* 208 U. S. 570, 578 (1908) ("Alien citizens, by the policy and practice of the courts of this country, are ordinarily permitted to resort to the courts for the redress of wrongs and the

protection of their rights"). And indeed, 28 U. S. C. § 1350 explicitly confers the privilege of suing for an actionable "tort . . . committed in violation of the law of nations or a treaty of the United States" on aliens alone. The fact that petitioners in these cases are being held in military custody is immaterial to the question of the District Court's jurisdiction over their nonhabeas statutory claims.

## VI

Whether and what further proceedings may become necessary after respondents make their response to the merits of petitioners' claims are matters that we need not address now. What is presently at stake is only whether the federal courts have jurisdiction to determine the legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing. Answering that question in the affirmative, we reverse the judgment of the Court of Appeals and remand these cases for the District Court to consider in the first instance the merits of petitioners' claims.

*It is so ordered.*

JUSTICE KENNEDY, concurring in the judgment.

The Court is correct, in my view, to conclude that federal courts have jurisdiction to consider challenges to the legality of the detention of foreign nationals held at the Guantanamo Bay Naval Base in Cuba. While I reach the same conclusion, my analysis follows a different course. JUSTICE SCALIA exposes the weakness in the Court's conclusion that *Braden* v. *30th Judicial Circuit Court of Ky.*, 410 U. S. 484 (1973), "overruled the statutory predicate to *Eisentrager*'s holding," *ante*, at 479. As he explains, the Court's approach is not a plausible reading of *Braden* or *Johnson* v. *Eisentrager*, 339 U. S. 763 (1950). In my view, the correct course is to follow the framework of *Eisentrager*.

*Eisentrager* considered the scope of the right to petition for a writ of habeas corpus against the backdrop of the con-

stitutional command of the separation of powers. The issue before the Court was whether the Judiciary could exercise jurisdiction over the claims of German prisoners held in the Landsberg prison in Germany following the cessation of hostilities in Europe. The Court concluded the petition could not be entertained. The petition was not within the proper realm of the judicial power. It concerned matters within the exclusive province of the Executive, or the Executive and Congress, to determine.

The Court began by noting the "ascending scale of rights" that courts have recognized for individuals depending on their connection to the United States. *Id.*, at 770. Citizenship provides a longstanding basis for jurisdiction, the Court noted, and among aliens physical presence within the United States also "gave the Judiciary power to act." *Id.*, at 769, 771. This contrasted with the "essential pattern for seasonable Executive constraint of enemy aliens." *Id.*, at 773. The place of the detention was also important to the jurisdictional question, the Court noted. Physical presence in the United States "implied protection," *id.*, at 777–778, whereas in *Eisentrager* "th[e] prisoners at no relevant time were within any territory over which the United States is sovereign," *id.*, at 778. The Court next noted that the prisoners in *Eisentrager* "were actual enemies" of the United States, proven to be so at trial, and thus could not justify "a limited opening of our courts" to distinguish the "many [aliens] of friendly personal disposition to whom the status of enemy" was unproven. *Ibid.* Finally, the Court considered the extent to which jurisdiction would "hamper the war effort and bring aid and comfort to the enemy." *Id.*, at 779. Because the prisoners in *Eisentrager* were proven enemy aliens found and detained outside the United States, and because the existence of jurisdiction would have had a clear harmful effect on the Nation's military affairs, the matter was appropriately left to the Executive Branch and there was no jurisdiction for the courts to hear the prisoner's claims.

The decision in *Eisentrager* indicates that there is a realm of political authority over military affairs where the judicial power may not enter. The existence of this realm acknowledges the power of the President as Commander in Chief, and the joint role of the President and the Congress, in the conduct of military affairs. A faithful application of *Eisentrager*, then, requires an initial inquiry into the general circumstances of the detention to determine whether the Court has the authority to entertain the petition and to grant relief after considering all of the facts presented. A necessary corollary of *Eisentrager* is that there are circumstances in which the courts maintain the power and the responsibility to protect persons from unlawful detention even where military affairs are implicated. See also *Ex parte Milligan*, 4 Wall. 2 (1866).

The facts here are distinguishable from those in *Eisentrager* in two critical ways, leading to the conclusion that a federal court may entertain the petitions. First, Guantanamo Bay is in every practical respect a United States territory, and it is one far removed from any hostilities. The opinion of the Court well explains the history of its possession by the United States. In a formal sense, the United States leases the Bay; the 1903 lease agreement states that Cuba retains "ultimate sovereignty" over it. Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U. S.-Cuba, Art. III, T. S. No. 418. At the same time, this lease is no ordinary lease. Its term is indefinite and at the discretion of the United States. What matters is the unchallenged and indefinite control that the United States has long exercised over Guantanamo Bay. From a practical perspective, the indefinite lease of Guantanamo Bay has produced a place that belongs to the United States, extending the "implied protection" of the United States to it. *Eisentrager, supra,* at 777–778.

The second critical set of facts is that the detainees at Guantanamo Bay are being held indefinitely, and without

benefit of any legal proceeding to determine their status. In *Eisentrager*, the prisoners were tried and convicted by a military commission of violating the laws of war and were sentenced to prison terms. Having already been subject to procedures establishing their status, they could not justify "a limited opening of our courts" to show that they were "of friendly personal disposition" and not enemy aliens. 339 U. S., at 778. Indefinite detention without trial or other proceeding presents altogether different considerations. It allows friends and foes alike to remain in detention. It suggests a weaker case of military necessity and much greater alignment with the traditional function of habeas corpus. Perhaps, where detainees are taken from a zone of hostilities, detention without proceedings or trial would be justified by military necessity for a matter of weeks; but as the period of detention stretches from months to years, the case for continued detention to meet military exigencies becomes weaker.

In light of the status of Guantanamo Bay and the indefinite pretrial detention of the detainees, I would hold that federal-court jurisdiction is permitted in these cases. This approach would avoid creating automatic statutory authority to adjudicate the claims of persons located outside the United States, and remains true to the reasoning of *Eisentrager*. For these reasons, I concur in the judgment of the Court.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, dissenting.

The Court today holds that the habeas statute, 28 U. S. C. §2241, extends to aliens detained by the United States military overseas, outside the sovereign borders of the United States and beyond the territorial jurisdictions of all its courts. This is not only a novel holding; it contradicts a half-century-old precedent on which the military undoubtedly relied, *Johnson* v. *Eisentrager*, 339 U. S. 763 (1950). The Court's contention that *Eisentrager* was somehow ne-

gated by *Braden* v. *30th Judicial Circuit Court of Ky.*, 410 U. S. 484 (1973)—a decision that dealt with a different issue and did not so much as mention *Eisentrager*—is implausible in the extreme. This is an irresponsible overturning of settled law in a matter of extreme importance to our forces currently in the field. I would leave it to Congress to change § 2241, and dissent from the Court's unprecedented holding.

## I

As we have repeatedly said: "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree. It is to be presumed that a cause lies outside this limited jurisdiction . . . ." *Kokkonen* v. *Guardian Life Ins. Co. of America*, 511 U. S. 375, 377 (1994) (citations omitted). The petitioners do not argue that the Constitution independently requires jurisdiction here.[1] Accordingly, these cases turn on the words of § 2241, a text the Court today largely ignores. Even a cursory reading of the habeas statute shows that it presupposes a federal district court with territorial jurisdiction over the detainee. Section 2241(a) states:

> "Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge *within their respective jurisdictions.*" (Emphasis added.)

It further requires that "[t]he order of a circuit judge shall be entered in the records of *the* district court of *the district wherein the restraint complained of is had.*" (Emphases added.) And § 2242 provides that a petition "addressed to the Supreme Court, a justice thereof or a circuit judge . . .

---

[1] See Tr. of Oral Arg. 5 ("Question: And you don't raise the issue of any potential jurisdiction on the basis of the Constitution alone. We are here debating the jurisdiction under the Habeas Statute, is that right? [Answer]: That's correct . . .").

shall state the reasons for not making application to *the* district court of *the district in which the applicant is held.*" (Emphases added.)   No matter to whom the writ is directed, custodian or detainee, the statute could not be clearer that a necessary requirement for issuing the writ is that *some* federal district court have territorial jurisdiction over the detainee.   Here, as the Court allows, see *ante,* at 478, the Guantanamo Bay detainees are not located within the territorial jurisdiction of any federal district court.   One would think that is the end of these cases.

The Court asserts, however, that the decisions of this Court have placed a gloss on the phrase "within their respective jurisdictions" in § 2241 which allows jurisdiction in these cases.   That is not so.   In fact, the only case in point holds just the opposite (and just what the statute plainly says). That case is *Eisentrager,* but to fully understand its implications for the present dispute, I must also discuss our decisions in the earlier case of *Ahrens* v. *Clark,* 335 U. S. 188 (1948), and the later case of *Braden.*

In *Ahrens,* the Court considered "whether the presence within the territorial jurisdiction of the District Court of the person detained is prerequisite to filing a petition for a writ of *habeas corpus.*"   335 U. S., at 189 (construing 28 U. S. C. § 452, the statutory precursor to § 2241).   The *Ahrens* detainees were held at Ellis Island, New York, but brought their petitions in the District Court for the District of Columbia.   Interpreting "within their respective jurisdictions," the Court held that a district court has jurisdiction to issue the writ only on behalf of petitioners detained within its territorial jurisdiction.   It was "not sufficient . . . that the jailer or custodian alone be found in the jurisdiction." 335 U. S., at 190.

*Ahrens* explicitly reserved "the question of what process, if any, a person confined in an area not subject to the jurisdiction of any district court may employ to assert federal rights."   *Id.,* at 192, n. 4.   That question, the same question

presented to this Court today, was shortly thereafter resolved in *Eisentrager* insofar as noncitizens are concerned. *Eisentrager* involved petitions for writs of habeas corpus filed in the District Court for the District of Columbia by German nationals imprisoned in Landsberg Prison, Germany. The District Court, relying on *Ahrens*, dismissed the petitions because the petitioners were not located within its territorial jurisdiction. The Court of Appeals reversed. According to the Court today, the Court of Appeals "implicitly conceded that the District Court lacked jurisdiction under the habeas statute as it had been interpreted in *Ahrens*," and "[i]n essence . . . concluded that the habeas statute, as construed in *Ahrens*, had created an unconstitutional gap that had to be filled by reference to 'fundamentals.'" *Ante*, at 477, 478. That is not so. The Court of Appeals concluded that there *was* statutory jurisdiction. It arrived at that conclusion by applying the canon of constitutional avoidance: "[I]f the existing jurisdictional act be construed to deny the writ to a person entitled to it as a substantive right, the act would be unconstitutional. It should be construed, if possible, to avoid that result." *Eisentrager* v. *Forrestal*, 174 F. 2d 961, 966 (CADC 1949). In cases where there was no territorial jurisdiction over the detainee, the Court of Appeals held, the writ would lie at the place of a respondent with directive power over the detainee. "It is not too violent an interpretation of 'custody' to construe it as including those who have directive custody, as well as those who have immediate custody, where such interpretation is necessary to comply with constitutional requirements. . . . *The statute must be so construed,* lest it be invalid as constituting a suspension of the writ in violation of the constitutional provision." *Id.,* at 967 (emphasis added).[2]

---

[2] The parties' submissions to the Court in *Johnson* v. *Eisentrager*, 339 U. S. 763 (1950), construed the Court of Appeals' decision as I do. See Pet. for Cert., O. T. 1949, No. 306, pp. 8–9 ("[T]he court felt constrained to construe the habeas corpus jurisdictional statute—despite its reference to

This Court's judgment in *Eisentrager* reversed the Court of Appeals. The opinion was largely devoted to rejecting the lower court's constitutional analysis, since the doctrine of constitutional avoidance underlay its statutory conclusion. But the opinion *had* to pass judgment on whether the statute granted jurisdiction, since that was the basis for the judgments of both lower courts. A conclusion of no constitutionally conferred right would obviously not support reversal of a judgment that rested upon a statutorily conferred right.[3]

---

the 'respective jurisdictions' of the various courts and the gloss put on that terminology in the *Ahrens* and previous decisions—to permit a petition to be filed in the district court with territorial jurisdiction over the officials who have directive authority over the immediate jailer in Germany"); Brief for Respondent, O. T. 1949, No. 306, p. 9 ("Respondent contends that the U. S. Court of Appeals . . . was correct in its holding that the statute, 28 U. S. C. 2241, provides that the U. S. District Court for the District of Columbia has jurisdiction to entertain the petition for a writ of habeas corpus in the case at bar"). Indeed, the briefing in *Eisentrager* was mainly devoted to the question whether there was statutory jurisdiction. See, *e. g.*, Brief for Petitioner, O. T. 1949, No. 306, pp. 15–59; Brief for Respondent, O. T. 1949, No. 306, at 9–27, 38–49.

[3] The Court does not seriously dispute my analysis of the Court of Appeals' holding in *Eisentrager*. Instead, it argues that this Court in *Eisentrager* "understood the Court of Appeals' decision to rest on constitutional and not statutory grounds." *Ante*, at 478, n. 8. That is inherently implausible, given that the Court of Appeals' opinion clearly reached a statutory holding, and that both parties argued the case to this Court on that basis, see n. 2, *supra*. The only evidence of misunderstanding the Court adduces today is the *Eisentrager* Court's description of the Court of Appeals' reasoning as "that, although no statutory jurisdiction of such cases is given, courts must be held to possess it as part of the judicial power of the United States . . . ." 339 U. S., at 767. That is no misunderstanding, but an entirely accurate description of the Court of Appeals' reasoning— the penultimate step of that reasoning rather than its conclusion. The Court of Appeals went on to hold that, in light of the constitutional imperative, the statute should be interpreted as supplying jurisdiction. See *Eisentrager* v. *Forrestal*, 174 F. 2d 961, 965–967 (CADC 1949). This Court in *Eisentrager* undoubtedly understood that, which is why it immediately followed the foregoing description with a description of the Court of Appeals' *conclusion* tied to the language of the habeas statute:

And absence of a right to the writ under the clear wording of the habeas statute is what the *Eisentrager* opinion held: "Nothing in the text of the Constitution extends such a right, *nor does anything in our statutes.*" 339 U. S., at 768 (emphasis added). "[T]hese prisoners at no relevant time were within any territory over which the United States is sovereign, and the scenes of their offense, their capture, their trial and their punishment *were all beyond the territorial jurisdiction of any court of the United States.*" *Id.,* at 777–778. See also *id.,* at 781 (concluding that "no right to the writ of *habeas corpus* appears"); *id.,* at 790 (finding "no basis for invoking federal judicial power in any district"). The brevity of the Court's statutory analysis signifies nothing more than that the Court considered it obvious (as indeed it is) that, unaided by the canon of constitutional avoidance, the statute did not confer jurisdiction over an alien detained outside the territorial jurisdiction of the courts of the United States.

*Eisentrager*'s directly-on-point statutory holding makes it exceedingly difficult for the Court to reach the result it desires today. To do so neatly and cleanly, it must either argue that our decision in *Braden* overruled *Eisentrager,* or admit that *it* is overruling *Eisentrager.* The former course would not pass the laugh test, inasmuch as *Braden* dealt with a detainee held within the territorial jurisdiction of a district court, and never *mentioned Eisentrager.* And the latter course would require the Court to explain why our almost categorical rule of *stare decisis* in statutory cases should be set aside in order to complicate the present war, *and,* having set it aside, to explain why the habeas statute does not mean what it plainly says. So instead the Court tries an oblique course: *"Braden,"* it claims, "overruled *the statutory predi-*

"[W]here deprivation of liberty by an official act occurs outside the territorial jurisdiction of any District Court, the petition will lie in the District Court which has territorial jurisdiction over officials who have directive power over the immediate jailer." 339 U. S., at 767.

*cate* to *Eisentrager*'s holding," *ante,* at 479 (emphasis added), by which it means the statutory analysis of *Ahrens.* Even assuming, for the moment, that *Braden* overruled some aspect of *Ahrens,* inasmuch as *Ahrens* did not pass upon any of the statutory issues decided by *Eisentrager,* it is hard to see how any of that case's "statutory predicate" could have been impaired.

But in fact *Braden* did not overrule *Ahrens;* it distinguished *Ahrens. Braden* dealt with a habeas petitioner incarcerated in Alabama. The petitioner filed an application for a writ of habeas corpus in Kentucky, challenging an indictment that had been filed against him in that Commonwealth and naming as respondent the Kentucky court in which the proceedings were pending. This Court held that Braden was in custody because a detainer had been issued against him by Kentucky, and was being executed by Alabama, serving as an agent for Kentucky. We found that jurisdiction existed in Kentucky for Braden's petition challenging the Kentucky detainer, notwithstanding his physical confinement in Alabama. *Braden* was careful to *distinguish* that situation from the general rule established in *Ahrens.*

> "A further, *critical* development since our decision in *Ahrens* is the emergence of *new classes of prisoners* who are able to petition for habeas corpus because of the adoption of a more expansive definition of the 'custody' requirement of the habeas statute. The overruling of *McNally* v. *Hill,* 293 U. S. 131 (1934), made it possible for prisoners in custody under one sentence to attack a sentence which they had not yet begun to serve. And it also enabled a petitioner held in one State to attack a detainer lodged against him by another State. In such a case, the State holding the prisoner in immediate confinement acts as agent for the demanding State, and the custodian State is presumably indifferent to the resolution of the prisoner's attack on the detainer. Here, for example, the petitioner is confined in Alabama, but his

dispute is with the Commonwealth of Kentucky, not the State of Alabama. *Under these circumstances,* it would serve no useful purpose to apply the *Ahrens* rule and require that the action be brought in Alabama." 410 U. S., at 498–499 (citations and footnotes omitted; emphases added).

This cannot conceivably be construed as an overturning of the *Ahrens* rule *in other circumstances.* See also *Braden, supra,* at 499–500 (noting that *Ahrens* does not establish "an inflexible jurisdictional rule dictating the choice of an inconvenient forum *even in a class of cases which could not have been foreseen at the time of that decision"* (emphasis added)). Thus, *Braden* stands for the proposition, and only the proposition, that where a petitioner is in custody in multiple jurisdictions within the United States, he may seek a writ of habeas corpus in a jurisdiction in which he suffers legal confinement, though not physical confinement, if his challenge is to that legal confinement. Outside that class of cases, *Braden* did not question the general rule of *Ahrens* (much less that of *Eisentrager*). Where, as here, present physical custody is at issue, *Braden* is inapposite, and *Eisentrager* unquestionably controls.[4]

---

[4] The Court points to Court of Appeals cases that have described *Braden* as "overruling" *Ahrens.* See *ante,* at 479–480, n. 9. Even if that description (rather than what I think the correct one, "distinguishing") is accepted, it would not support the Court's view that *Ahrens* was overruled *with regard to the point on which Eisentrager relied.* The *ratio decidendi* of *Braden* does not call into question the principle of *Ahrens* applied in *Eisentrager:* that habeas challenge to present physical confinement must be made in the district where the physical confinement exists. The Court is unable to produce a single authority that agrees with its conclusion that *Braden* overruled *Eisentrager.*

JUSTICE KENNEDY recognizes that *Eisentrager* controls, *ante,* at 485 (opinion concurring in judgment), but misconstrues that opinion. He thinks it makes jurisdiction under the habeas statute turn on the circumstances of the detainees' confinement—including, apparently, the availability of legal proceedings and the length of detention, see *ante,* at 487–

The considerations of forum convenience that drove the analysis in *Braden* do not call into question *Eisentrager's* holding. The *Braden* opinion is littered with venue reasoning of the following sort: "The expense and risk of transporting the petitioner to the Western District of Kentucky, should his presence at a hearing prove necessary, would in all likelihood be outweighed by the difficulties of transporting records and witnesses from Kentucky to the district where petitioner is confined." 410 U. S., at 494. Of course nothing could be *more* inconvenient than what the Court (on the alleged authority of *Braden*) prescribes today: a domestic hearing for persons held abroad, dealing with events that transpired abroad.

Attempting to paint *Braden* as a refutation of *Ahrens* (and thereby, it is suggested, *Eisentrager*), today's Court imprecisely describes *Braden* as citing with approval post-*Ahrens* cases in which "habeas petitioners" located overseas were allowed to proceed (without consideration of the jurisdictional issue) in the District Court for the District of Columbia. *Ante,* at 479. In fact, what *Braden* said is that "[w]here *American citizens* confined overseas (and thus outside the territory of any district court) have sought relief in habeas corpus, we have held, if only implicitly, that the

---

488. The *Eisentrager* Court mentioned those circumstances, however, only in the course of its *constitutional* analysis, and not in its application of the statute. It is quite impossible to read §2241 as conditioning its geographic scope upon them. Among the consequences of making jurisdiction turn upon circumstances of confinement are (1) that courts would *always* have authority to inquire into circumstances of confinement, and (2) that the Executive would be unable to know with certainty that any given prisoner-of-war camp is immune from writs of habeas corpus. And among the questions this approach raises: When does definite detention become indefinite? How much process will suffice to stave off jurisdiction? If there is a terrorist attack at Guantanamo Bay, will the area suddenly fall outside the habeas statute because it is no longer "far removed from any hostilities," *ante,* at 487? JUSTICE KENNEDY's approach provides enticing law-school-exam imponderables in an area where certainty is called for.

petitioners' absence from the district does not present a jurisdictional obstacle to the consideration of the claim." 410 U. S., at 498 (emphasis added). Of course "the existence of unaddressed jurisdictional defects has no precedential effect," *Lewis* v. *Casey*, 518 U. S. 343, 352, n. 2 (1996) (citing cases), but we need not "overrule" those implicit holdings to decide these cases. Since *Eisentrager itself* made an exception for such cases, they in no way impugn its holding. "With the citizen," *Eisentrager* said, "we are now little concerned, except to set his case apart *as untouched by this decision* and to take measure of the difference between his status and that of all categories of aliens." 339 U. S., at 769. The constitutional doubt that the Court of Appeals in *Eisentrager* had erroneously attributed to the lack of habeas for an alien abroad might indeed exist with regard to a *citizen* abroad—justifying a strained construction of the habeas statute, or (more honestly) a determination of constitutional right to habeas. Neither party to the present case challenges the atextual extension of the habeas statute to United States citizens held beyond the territorial jurisdictions of the United States courts; but the possibility of one atextual exception thought to be required by the Constitution is no justification for abandoning the clear application of the text to a situation in which it raises no constitutional doubt.

The reality is this: Today's opinion, and today's opinion alone, overrules *Eisentrager;* today's opinion, and today's opinion alone, extends the habeas statute, for the first time, to aliens held beyond the sovereign territory of the United States and beyond the territorial jurisdiction of its courts. No reasons are given for this result; no acknowledgment of its consequences made. By spurious reliance on *Braden* the Court evades explaining why *stare decisis* can be disregarded, *and why Eisentrager was wrong.* Normally, we consider the interests of those who have relied on our decisions. Today, the Court springs a trap on the Executive, subjecting Guantanamo Bay to the oversight of the federal

courts even though it has never before been thought to be within their jurisdiction—and thus making it a foolish place to have housed alien wartime detainees.

## II

In abandoning the venerable statutory line drawn in *Eisentrager*, the Court boldly extends the scope of the habeas statute to the four corners of the earth. Part III of its opinion asserts that *Braden* stands for the proposition that "a district court acts 'within [its] respective jurisdiction' within the meaning of § 2241 as long as 'the custodian can be reached by service of process.'" *Ante*, at 478–479. Endorsement of that proposition is repeated in Part IV. *Ante*, at 483–484 ("Section 2241, by its terms, requires nothing more [than the District Court's jurisdiction over petitioners' custodians]").

The consequence of this holding, as applied to aliens outside the country, is breathtaking. It permits an alien captured in a foreign theater of active combat to bring a § 2241 petition against the Secretary of Defense. Over the course of the last century, the United States has held millions of alien prisoners abroad. See, *e. g.*, Department of Army, G. Lewis & J. Mewha, History of Prisoner of War Utilization by the United States Army 1776–1945, Pamphlet No. 20–213, p. 244 (1955) (noting that, "[b]y the end of hostilities [in World War II], U. S. forces had in custody approximately two million enemy soldiers"). A great many of these prisoners would no doubt have complained about the circumstances of their capture and the terms of their confinement. The military is currently detaining over 600 prisoners at Guantanamo Bay alone; each detainee undoubtedly has complaints—real or contrived—about those terms and circumstances. The Court's unheralded expansion of federal-court jurisdiction is not even mitigated by a comforting assurance that the legion of ensuing claims will be easily resolved on the merits. To the contrary, the Court says that the "[p]etitioners' allegations . . . unquestionably describe 'custody in violation

of the Constitution or laws or treaties of the United States.'"
*Ante,* at 483, n. 15 (citing *United States* v. *Verdugo-Urquidez,*
494 U. S. 259, 277–278 (1990) (KENNEDY, J., concurring)).
From this point forward, federal courts will entertain peti-
tions from these prisoners, and others like them around the
world, challenging actions and events far away, and forcing
the courts to oversee one aspect of the Executive's conduct
of a foreign war.

Today's carefree Court disregards, without a word of ac-
knowledgment, the dire warning of a more circumspect
Court in *Eisentrager:*

> "To grant the writ to these prisoners might mean that
> our army must transport them across the seas for hear-
> ing. This would require allocation for shipping space,
> guarding personnel, billeting and rations. It might also
> require transportation for whatever witnesses the pris-
> oners desired to call as well as transportation for those
> necessary to defend legality of the sentence. The writ,
> since it is held to be a matter of right, would be equally
> available to enemies during active hostilities as in the
> present twilight between war and peace. Such trials
> would hamper the war effort and bring aid and comfort
> to the enemy. They would diminish the prestige of our
> commanders, not only with enemies but with wavering
> neutrals. It would be difficult to devise more effective
> fettering of a field commander than to allow the very
> enemies he is ordered to reduce to submission to call
> him to account in his own civil courts and divert his
> efforts and attention from the military offensive abroad
> to the legal defensive at home. Nor is it unlikely that
> the result of such enemy litigiousness would be a conflict
> between judicial and military opinion highly comforting
> to enemies of the United States." 339 U. S., at 778–779.

These results should not be brought about lightly, and cer-
tainly not without a textual basis in the statute and on the

strength of nothing more than a decision dealing with an Alabama prisoner's ability to seek habeas in Kentucky.

### III

Part IV of the Court's opinion, dealing with the status of Guantanamo Bay, is a puzzlement. The Court might have made an effort (a vain one, as I shall discuss) to distinguish *Eisentrager* on the basis of a difference between the status of Landsberg Prison in Germany and Guantanamo Bay Naval Base. But Part III flatly rejected such an approach, holding that the place of detention of an alien has no bearing on the statutory availability of habeas relief, but "is strictly relevant only to the question of the appropriate forum." *Ante*, at 479. That rejection is repeated at the end of Part IV: "In the end, the answer to the question presented is clear. . . . No party questions the District Court's jurisdiction over petitioners' custodians. . . . Section 2241, by its terms, requires nothing more." *Ante*, at 483–484. Once that has been said, the status of Guantanamo Bay is entirely irrelevant to the issue here. The habeas statute is (according to the Court) being applied *domestically*, to "petitioners' custodians," and the doctrine that statutes are presumed to have no extraterritorial effect simply has no application.

Nevertheless, the Court spends most of Part IV rejecting respondents' invocation of that doctrine on the peculiar ground that it has no application to Guantanamo Bay. Of course if the Court is right about that, not only § 2241 but presumably *all* United States law applies there—including, for example, the federal cause of action recognized in *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971), which would allow prisoners to sue their captors for damages. Fortunately, however, the Court's irrelevant discussion also happens to be wrong.

The Court gives only two reasons why the presumption against extraterritorial effect does not apply to Guantanamo Bay. First, the Court says (without any further elaboration)

that "the United States exercises 'complete jurisdiction and control' over the Guantanamo Bay Naval Base [under the terms of a 1903 lease agreement], and may continue to exercise such control permanently if it so chooses [under the terms of a 1934 Treaty]." *Ante,* at 480; see *ante,* at 471. But that lease agreement explicitly recognized "the continuance of the ultimate sovereignty of the Republic of Cuba over the [leased areas]," Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U. S.-Cuba, Art. III, T. S. No. 418, and the Executive Branch—whose head is "exclusively responsible" for the "conduct of diplomatic and foreign affairs," *Eisentrager, supra,* at 789—affirms that the lease and treaty do not render Guantanamo Bay the sovereign territory of the United States, see Brief for Respondents 21.

The Court does not explain how "complete jurisdiction and control" without sovereignty causes an enclave to be part of the United States for purposes of its domestic laws. Since "jurisdiction and control" obtained through a lease is no different in effect from "jurisdiction and control" acquired by lawful force of arms, parts of Afghanistan and Iraq should logically be regarded as subject to our domestic laws. Indeed, if "jurisdiction and control" rather than sovereignty were the test, so should the Landsberg Prison in Germany, where the United States held the *Eisentrager* detainees.

The second and last reason the Court gives for the proposition that domestic law applies to Guantanamo Bay is the Solicitor General's concession that there would be habeas jurisdiction over a United States citizen in Guantanamo Bay. "Considering that the statute draws no distinction between Americans and aliens held in federal custody, there is little reason to think that Congress intended the geographical coverage of the statute to vary depending on the detainee's citizenship." *Ante,* at 481. But the reason the Solicitor General conceded there would be jurisdiction over a detainee who was a United States citizen had *nothing to do* with the special status of Guantanamo Bay: "Our answer to that ques-

tion, Justice Souter, is that citizens of the United States, because of their constitutional circumstances, may have greater rights with respect to the scope and reach of the Habeas Statute as the Court has or would interpret it." Tr. of Oral Arg. 40. See also *id.*, at 27–28. And *that* position—the position that United States citizens throughout the world may be entitled to habeas corpus rights—is precisely the position that this Court adopted in *Eisentrager*, see 339 U. S., at 769–770, even while holding that aliens abroad *did not have* habeas corpus rights. Quite obviously, the Court's second reason has no force whatever.

The last part of the Court's Part IV analysis digresses from the point that the presumption against extraterritorial application does not apply to Guantanamo Bay. Rather, it is directed to the contention that the Court's approach to habeas jurisdiction—applying it to aliens abroad—is "consistent with the historical reach of the writ." *Ante,* at 481. None of the authorities it cites comes close to supporting that claim. Its first set of authorities involves claims by aliens detained in what is indisputably domestic territory. *Ante,* at 481–482, n. 11. Those cases are irrelevant because they do not purport to address the territorial reach of the writ. The remaining cases involve issuance of the writ to "'exempt jurisdictions'" and "other dominions under the sovereign's control." *Ante,* at 482, and nn. 12–13. These cases are inapposite for two reasons: Guantanamo Bay is not a sovereign dominion, and even if it were, jurisdiction would be limited to subjects.

"Exempt jurisdictions"—the Cinque Ports and Counties Palatine (located in modern-day England)—were local franchises granted by the Crown. See 1 W. Holdsworth, History of English Law 108, 532 (7th ed. rev. 1956); 3 W. Blackstone, Commentaries on the Laws of England 78–79 (1768) (hereinafter Blackstone). These jurisdictions were "exempt" in the sense that the Crown had ceded management of municipal affairs to local authorities, whose courts had exclusive juris-

diction over private disputes among residents (although review was still available in the royal courts by writ of error). See *id.*, at 79. Habeas jurisdiction nevertheless extended to those regions on the theory that the delegation of the King's authority did not include his own prerogative writs. *Ibid.*; R. Sharpe, Law of Habeas Corpus 188–189 (2d ed. 1989) (hereinafter Sharpe). Guantanamo Bay involves no comparable local delegation of pre-existing sovereign authority.

The cases involving "other dominions under the sovereign's control" fare no better. These cases stand only for the proposition that the writ extended to dominions of the Crown outside England proper. The authorities relating to Jersey and the other Channel Islands, for example, see *ante*, at 482, n. 13, involve territories that are "dominions of the crown of Great Britain" even though not "part of the kingdom of England," 1 Blackstone 102–105 (1765), much as were the colonies in America, *id.*, at 104–105, and Scotland, Ireland, and Wales, *id.*, at 93. See also *King* v. *Cowle*, 2 Burr. 834, 853–854, 97 Eng. Rep. 587, 598 (K. B. 1759) (even if Berwick was "no part of the realm of England," it was still a "dominion of the Crown"). All of the dominions in the cases the Court cites—and all of the territories Blackstone lists as dominions, see 1 Blackstone 93–106—are the sovereign territory of the Crown: colonies, acquisitions and conquests, and so on. It is an enormous extension of the term to apply it to installations merely leased for a particular use from another nation that still retains ultimate sovereignty.

The Court's historical analysis fails for yet another reason: To the extent the writ's "extraordinary territorial ambit" did extend to exempt jurisdictions, outlying dominions, and the like, that extension applied only to British *subjects*. The very sources the majority relies on say so: Sharpe explains the "broader ambit" of the writ on the ground that it is "said to depend not on the ordinary jurisdiction of the court for its effectiveness, but upon the authority of the sovereign over

all her *subjects*." Sharpe 188 (emphasis added). Likewise, Blackstone explained that the writ "run[s] into all parts of the king's dominions" because "the king is at all times entitled to have an account why the liberty of any of his *subjects* is restrained." 3 Blackstone 131 (emphasis added). *Ex parte Mwenya*, [1960] 1 Q. B. 241 (C. A.), which can hardly be viewed as evidence of the *historic* scope of the writ, only confirms the ongoing relevance of the sovereign-subject relationship to the scope of the writ. There, the question was whether "the Court of Queen's Bench [can] be debarred from making an order in favour of a British citizen unlawfully or arbitrarily detained" in Northern Rhodesia, which was at the time a protectorate of the Crown. *Id.*, at 300 (Lord Evershed, M. R.). Each judge made clear that the detainee's status as a subject was material to the resolution of the case. See *id.*, at 300, 302 (Lord Evershed, M. R.); *id.*, at 305 (Romer, L. J.) ("[I]t is difficult to see why the sovereign should be deprived of her right to be informed through her High Court as to the validity of the detention of her subjects in that territory"); *id.*, at 311 (Sellers, L. J.) ("I am not prepared to say, as we are solely asked to say on this appeal, that the English courts have no jurisdiction in any circumstances to entertain an application for a writ of habeas corpus ad subjiciendum in respect of an unlawful detention of a British subject in a British protectorate"). None of the exempt-jurisdiction or dominion cases the Court cites involves someone not a subject of the Crown.

The rule against issuing the writ to aliens in foreign lands was still the law when, in *In re Ning Yi-Ching*, 56 T. L. R. 3 (K. B. Vac. Ct. 1939), an English court considered the habeas claims of four Chinese subjects detained on criminal charges in Tientsin, China, an area over which Britain had by treaty acquired a lease and "therewith exercised certain rights of administration and control." *Id.*, at 4. The court held that Tientsin was a foreign territory, and that the writ would not

issue to a foreigner detained there. The Solicitor-General had argued that "[t]here was no case on record in which a writ of *habeas corpus* had been obtained on behalf of a foreign subject on foreign territory," *id.*, at 5, and the court "listened in vain for a case in which the writ of *habeas corpus* had issued in respect of a foreigner detained in a part of the world which was not a part of the King's dominions or realm," *id.*, at 6.[5]

In sum, the Court's treatment of Guantanamo Bay, like its treatment of § 2241, is a wrenching departure from precedent.[6]

---

[5] The Court argues at some length that *Ex parte Mwenya*, [1960] 1 Q. B. 241 (C. A.), calls into question my reliance on *In re Ning Yi-Ching*. See *ante*, at 15, n. 14. But as I have explained, see *supra*, at 504, *Mwenya* dealt with a British subject and the court went out of its way to explain that its expansive description of the scope of the writ was premised on that fact. The Court cites not a single case holding that aliens held outside the territory of the sovereign were within reach of the writ.

[6] The Court grasps at two other bases for jurisdiction: the Alien Tort Statute (ATS), 28 U. S. C. § 1350, and the federal-question statute, § 1331. The former is not presented to us. The ATS, while invoked below, was repudiated as a basis for jurisdiction by all petitioners, either in their petition for certiorari, in their briefing before this Court, or at oral argument. See Pet. for Cert. in No. 03–334, p. 2, n. 1 ("Petitioners withdraw any reliance on the Alien Tort Claims Act . . ."); Brief for Petitioners in No. 03–343, p. 13; Tr. of Oral Arg. 6.

With respect to § 1331, petitioners assert a variety of claims arising under the Constitution, treaties, and laws of the United States. In *Eisentrager*, though the Court's holding focused on § 2241, its analysis spoke more broadly: "We have pointed out that the privilege of litigation has been extended to aliens, whether friendly or enemy, only because permitting their presence in the country implied protection. No such basis can be invoked here, for these prisoners at no relevant time were within any territory over which the United States is sovereign, and the scenes of their offense, their capture, their trial and their punishment were all beyond the territorial jurisdiction of any court of the United States." 339 U. S., at 777–778. That reasoning dooms petitioners' claims under § 1331, at least where Congress has erected a jurisdictional bar to their raising such claims in habeas.

\* \* \*

Departure from our rule of *stare decisis* in statutory cases is always extraordinary; it ought to be unthinkable when the departure has a potentially harmful effect upon the Nation's conduct of a war. The Commander in Chief and his subordinates had every reason to expect that the internment of combatants at Guantanamo Bay would not have the consequence of bringing the cumbersome machinery of our domestic courts into military affairs. Congress is in session. If it wished to change federal judges' habeas jurisdiction from what this Court had previously held that to be, it could have done so. And it could have done so by intelligent revision of the statute,[7] instead of by today's clumsy, countertextual reinterpretation that confers upon wartime prisoners greater habeas rights than domestic detainees. The latter must challenge their present physical confinement in the district of their confinement, see *Rumsfeld* v. *Padilla, ante,* p. 426, whereas under today's strange holding Guantanamo Bay detainees can petition in any of the 94 federal judicial districts. The fact that extraterritorially located detainees lack the district of detention that the statute requires has been converted from a factor that precludes their ability to bring a petition at all into a factor that frees them to petition wherever they wish—and, as a result, to forum-shop. For this Court to create such a monstrous scheme in time of war, and in frustration of our military commanders' reliance upon clearly stated prior law, is judicial adventurism of the worst sort. I dissent.

---

[7] It could, for example, provide for jurisdiction by placing Guantanamo Bay within the territory of an existing district court; or by creating a district court for Guantanamo Bay, as it did for the Panama Canal Zone, see 22 U. S. C. § 3841(a) (repealed 1979).