ROGERS, Circuit Judge,
dissenting.
I can join neither the reasoning of the court nor its conclusion that the federal courts lack power to consider the detainees’ petitions. While I agree that Congress intended to withdraw federal jurisdiction through the Military Commissions Act of 2006, Pub.L. No. 109-366, 120 Stat. 2600 (“MCA”), the court’s holding that the MCA is consistent with the Suspension Clause of Article I, section 9, of the Constitution does not withstand analysis. By concluding that this court must reject “the detainees’ claims to constitutional rights,” Op. at 992, the court fundamentally misconstrues the nature of suspension: Far from conferring an individual right that might pertain only to persons substantially connected to the United States, see United *995 States v. Verdugo-Urquidez, 494 U.S. 259, 271, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), the Suspension Clause is a limitation on the powers of Congress. Consequently, it is only by misreading the historical record and ignoring the Supreme Court’s well-considered and binding dictum in Rasul v. Bush, 542 U.S. 466, 481-82, 124 S.Ct. 2686, 159 L.Ed.2d 548 (2004), that the writ at common law would have extended to the detainees, that the court can conclude that neither this court nor the district courts have jurisdiction to consider the detainees’ habeas claims.
A review of the text and operation of the Suspension Clause shows that, by nature, it operates to constrain the powers of Congress. Prior to the enactment of the MCA, the Supreme Court acknowledged that the detainees held at Guantanamo had a statutory right to habeas corpus. Rasul, 542 U.S. at 483-84, 124 S.Ct. 2686. The MCA purports to withdraw that right but does so in a manner that offends the constitutional constraint on suspension. The Suspension Clause limits the removal of habeas corpus, at least as the writ was understood at common law, to times of rebellion or invasion unless Congress provides an adequate alternative remedy. The writ would have reached the detainees at common law, and Congress has neither provided an adequate alternative remedy, through the Detainee Treatment Act of 2005, Pub.L. No. 109-148, Div. A, tit. X, 119 Stat. 2680, 2739 (“DTA”), nor invoked the exception to the Clause by making the required findings to suspend the writ. The MCA is therefore void and does not deprive this court or the district courts of jurisdiction.
On the merits of the detainees’ appeal in Khalid v. Bush, 355 F.Supp.2d 311 (D.D.C.2005) and the cross-appeals in In re Guantanamo Detainee Cases, 355 F.Supp.2d 443 (D.D.C.2005), I would affirm in part in Guantanamo Detainee Cases and reverse in Khalid and remand the cases to the district courts.
I.
Where a court has no jurisdiction it is powerless to act. See, e.g., Marbury v. Madison, 5 U.S. (1 Cranch) 137, 173-74, 2 L.Ed. 60 (1803). But a statute enacted by Congress purporting to deprive a court of jurisdiction binds that court only when Congress acts pursuant to the powers it derives from the Constitution. The court today concludes that the Suspension Clause is an individual right that cannot be invoked by the detainees. See Op. at 993. The text of the Suspension Clause and the structure of the Constitution belie this conclusion. The court farther concludes that the detainees would have had no access to the writ of habeas corpus at common law. See Op. at 998-90. The historical record and the guidance of the Supreme Court disprove this conclusion.
In this Part, I address the nature of the Suspension Clause, the retroactive effect of Congress’s recent enactment on habeas corpus — the MCA — and conclude with an assessment of the effect of the MCA in light of the dictates of the Constitution.
A.
The court holds that Congress may suspend habeas corpus as to the detainees because they have no individual rights under the Constitution. It is unclear where the court finds that the limit on suspension of the writ of habeas corpus is an individual entitlement. The Suspension Clause itself makes no reference to citizens or even persons. Instead, it directs that “[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.” U.S. Const, art. I, § 9, cl. 2. This mandate appears in the ninth section of Article I, which enumer *996 ates those actions expressly excluded from Congress’s powers. Although the Clause does not specifically say so, it is settled that only Congress may do the suspending. Ex parte Bollman, 8 U.S. (4 Cranch) 75, 101, 2 L.Ed. 554 (1807); see Hamdi v. Rumsfeld, 542 U.S. 507, 562, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (Scalia, J., dissenting); Ex parte Merryman, 17 F.Cas. 144, 151-152 (No. 9487) (Taney, Circuit Justice, C.C.D. Md. 1861); 2 Joseph Story, Commentaries on the Constitution of the United States § 1342 (5th ed. 1891). In this manner, by both its plain text and inclusion in section 9, the Suspension Clause differs from the Fourth Amendment, which establishes a “right of the people,” the Fifth Amendment, which limits how a “person shall be held,” and the Sixth Amendment, which provides rights to “the accused.” These provisions confer rights to the persons listed.[1]
The other provisions of Article I, section 9, indicate how to read the Suspension Clause. The clause immediately following provides that “[n]o Bill of Attainder or ex post facto Law shall be passed.”[2] The Supreme Court has construed the Attainder Clause as establishing a “category of Congressional actions which the Constitution barred.” United States v. Lovett, 328 U.S. 303, 315,106 Ct.Cl. 856, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946). In Lovett, the Court dismissed the possibility that an Act of Congress in violation of the Attainder Clause was non-justiciable, remarking;
Our Constitution did not contemplate such a result. To quote Alexander Hamilton,
* * * a limited constitution * * * [is] one which contains certain specified exceptions to the legislative authority; such, for instance, as that it shall pass no bills of attainder, no ex post facto laws, and the like. Limitations of this kind can be preserved in practice no other way than through the medium of the courts of justice; whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing.
Id. at 314, 66 S.Ct. 1073 (quoting The FedeRalist No. 78) (emphasis added) (alteration and omissions in original). So too, in Weaver v. Graham, 450 U.S. 24, 28-29 & n. 10, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981), where the Court noted that the ban *997 on ex post facto legislation “restricts governmental power by restraining arbitrary and potentially vindictive legislation” and acknowledged that the clause “confin[es] the legislature to penal decisions with prospective effect.” See also Marbury, 5 U.S. (1 Cranch) at 179-80; Foretich v. United States, 351 F.3d 1198, 1216-26 (D.C.Cir.2003). For like reasons, any act in violation of the Suspension Clause is void, cf. Lovett, 328 U.S. at 316, 66 S.Ct. 1073, and cannot operate to divest a court of jurisdiction.[3]
The court dismisses the distinction between individual rights and limitations on Congress’s powers. It chooses to make no affirmative argument of its own, instead hoping to rebut the sizable body of conflicting authorities.
The court appears to believe that the Suspension Clause is just like the constitutional amendments that form the Bill of Rights.[4] It is a truism, of course, that individual rights like those found in the first ten amendments work to limit Congress. However, individual rights are merely a subset of those matters that constrain the legislature. These two sets cannot be understood as coextensive unless the court is prepared to recognize such awkward individual rights as Commerce Clause rights, see U.S. Const, art. I, § 8, cl. 3, or the personal right not to have a bill raising revenue that originates in the Senate, see U.S. Const, art. I, § 7, cl. 1; see also Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 224, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974) (finding no individual right under the Ineligibility Clause).
That the Suspension Clause appears in Article I, section 9, is not happenstance. *998 In Charles Pinckney’s original proposal, suspension would have been part of the judiciary provision. It was moved in September 1789 by the Committee on Style and Arrangement, which gathered the restrictions on Congress’s power in one location. See William F. DukeR, A CONSTITUTIONAL HistoRY of Habeas Corpus 128-32 (1980); 2 The RECORDS of the Federal Convention of 1787, at 596 (Max Farrand ed., rev. ed.1966). By the court’s reasoning, the Framers placed the Suspension Clause in Article I merely because there were no similar individual rights to accompany it. It is implausible that the Framers would have viewed the Suspension Clause, as the court implies, as a budding Bill of Rights but would not have assigned the provision its own section of the Constitution, much as they did with the only crime specified in the document, treason, which appears alone in Article III, section 3. Instead, the court must treat the Suspension Clause’s placement in Article I, section 9, as a conscious determination of a limit on Congress’s powers. The Supreme Court has found similar meaning in the placement of constitutional clauses ever since McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 419-21, 4 L.Ed. 579 (1819) (Necessary and Proper Clause); see also, e.g., Skinner v. Mid-America Pipeline Co., 490 U.S. 212, 220-21, 109 S.Ct. 1726, 104 L.Ed.2d 250 (1989) (Taxing Clause).
The court also alludes to the idea that the Suspension Clause cannot apply to foreign military conflicts because the exception extends only to cases of “Rebellion or Invasion.” Op. at 992 n. 11. The Framers understood that the privilege of the writ was of such great significance that its suspension should be strictly limited to circumstances where the peace and security of the Nation were jeopardized. Only after considering alternative proposals authorizing suspension “on the most urgent occasions” or forbidding suspension outright did the Framers agree to a narrow exception upon a finding of rebellion or invasion. See 2 The Reoords of the Federal Convention of 1787, supra, at 438. Indeed, it would be curious if the Framers were implicitly sanctioning Executive-ordered detention abroad without judicial review by limiting suspension — and by the court’s reasoning therefore limiting habeas corpus — to domestic events. To the contrary, as Alexander Hamilton foresaw in The Federalist No. 8k, invoking William Blackstone,
To bereave a man of life (says he), or by violence to confiscate his estate, without accusation or trial, would be so gross and notorious an act of despotism, as must at once convey the alarm of tyranny throughout the whole nation; but confinement of the person, by secretly hurrying him to jail, where his sufferings are unknown or forgotten, is a less public, a less striking, and therefore a more dangerous engine of arbitrary government.
The Federalist No. 84, at 468 (E.H. Scott ed. 1898) (quoting William Blagkstone, 1 Commentaries * 131-32); see also Ex parte Milligan, 71 U.S. (4 Wall.) 2, 125, 18 L.Ed. 281 (1866).
B.
This court would have jurisdiction to address the detainees’ claims but for Congress’s enactment of the MCA. In Rasul, 542 U.S. at 483-84, 124 S.Ct. 2686, the Supreme Court held that the federal district courts had jurisdiction to hear petitions for writs of habeas corpus filed pursuant to 28 U.S.C. § 2241 by persons detained as “enemy combatants” by the United States at the Guantanamo Bay Naval Base. At the time, the habeas statute provided, in relevant part, that upon the filing of such a petition, the district court would promptly determine whether the petitioner was being held under the *999 laws, Constitution, and treaties of the United States, utilizing the common-law procedure of a return filed by the government and a traverse filed by the petitioner. See 28 U.S.C. §§ 2242-2253. After Rasul, Congress enacted the DTA, which purported to deprive the federal courts of habeas jurisdiction. DTA § 1005(e), 118 Stat. at 2741-43. The Supreme Court held in Hamdan v. Rumsfeld, — U.S.-, 126 S.Ct. 2749, 2764-69, 165 L.Ed.2d 723 (2006), however, that the DTA does not apply retroactively, and so it does not disturb this court’s jurisdiction over the instant appeals, which were already pending when the DTA became law.
As for the MCA, I concur in the court’s conclusion that, notwithstanding the requirements that Congress speak clearly when it intends its action to apply retroactively, see Landgraf v. USI Film Prods., 511 U.S. 244, 265-73, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), and when withdrawing habeas jurisdiction from the courts, see INS v. St. Cyr, 533 U.S. 289, 299, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001); Ex parte Yerger, 75 U.S. (8 Wall.) 85, 102, 19 L.Ed. 332 (1869), Congress sought in the MCA to revoke all federal jurisdiction retroactively as to the habeas petitions of detainees held at Guantanamo Bay. See Op. at 986-87. I do not join the court’s reasoning. The court stresses Congress’s emphasis that the provision setting the effective date for the jurisdictional change “shall apply to all cases, without exception.” However, the absence of exceptions does not establish the scope of the provision itself. The entire provision reads:
(b) — EFFECTIVE DATE. The amendment made by subsection (a) shall take effect on the date of the enactment of this Act, and shall apply to all cases, without exception, pending on or after the date of the enactment of this Act ivhich relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001.
MCA § 7(b), 120 Stat. at 2636 (emphasis added). Subsection (a), in turn, amends 28 U.S.C. § 2241(e), which confers habeas jurisdiction on the federal courts. New section 2241(e)(1) repeals “jurisdiction to hear or consider an application for a writ of habeas corpus.” New section 2241(e)(2) repeals “jurisdiction to hear or consider any other action ... relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement.”
The detainees suggest that by singling out habeas corpus in § 2241(e)(1) and by failing to do so in section 7(b) — and instead repeating the same list (“detention, transfer, treatment, trial, or conditions of confinement”) that appears in § 2241(e)(2) — Congress was expressing its intent to make the MCA retroactive only as to § 2241(e)(2). This argument hinges on their view that a petition for a writ of habeas corpus is not “relating to any aspect of ... detention.” But, by the plain text of section 7, it is clear that the detainees suggest ambiguity where there is none. As the court notes, see Op. at 987 n. 4, whereas § 2241(e)(1) refers to habeas corpus, § 2241(e)(2) deals with “any other action ... relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement.” (Emphasis added). By omitting the word “other” in section 7(b), and by cross-referencing section 7(a) in its entirety, Congress signaled its intent for the retroactivity provision to apply to habeas corpus cases. This conclusion has nothing to do with Congress’s emphasis that there are no exceptions and everything to do with the intent it expressed through the substantive provisions of the statute.
C.
The question, then, is whether by attempting to eliminate all federal court ju *1000 risdiction to consider petitions for writs of habeas corpus, Congress has overstepped the boundary established by the Suspension Clause. The Supreme Court has stated on several occasions that “at the absolute minimum, the Suspension Clause protects the writ ‘as it existed in 1789.’ ” St. Cyr, 533 U.S. at 301, 121 S.Ct. 2271 (quoting Felker v. Turpin, 518 U.S. 651, 663-64, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996)) (emphasis added). Therefore, at least insofar as habeas corpus exists and existed in 1789, Congress cannot suspend the writ without providing an adequate alternative except in the narrow exception specified in the Constitution.[5] This proscription applies equally to removing the writ itself and to removing all jurisdiction to issue the writ. See United States v. Klein, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1872). See generally Erwin Chemerinsicy, Federal Jurisdiction § 3.2 (4th ed.2003).
1.
Assessing the state of the law in 1789 is no trivial feat, and the court’s analysis today demonstrates how quickly a few missteps can obscure history. In conducting its historical review, the court emphasizes that no English cases predating 1789 award the relief that the detainees seek in their petitions. Op. at 989-91. “The short of the matter,” the court concludes, is that “habeas corpus would not have been available in 1789 to aliens without presence or property within the United States.” Op. at 990. But this misses the mark. There may well be no case at common law in which a court exercises jurisdiction over the habeas corpus claim of an alien from a friendly nation, who may himself be an enemy, who is captured abroad and held outside the sovereign territory of England but within the Crown’s exclusive control without being charged with a crime or violation of the Laws of War. On the other hand, the court can point to no case where an English court has refused to exercise habeas jurisdiction because the enemy being held, while under the control of the Crown, was not within the Crown’s dominions.[6] The paucity of direct precedent is a *1001 consequence of the unique confluence of events that defines the situation of these detainees and not a commentary on the reach of the writ at common law.
The question is whether by the process of inference from similar, if not identical, situations the reach of the writ at common law would have extended to the detainees’ petitions. At common law, we know that “the reach of the writ depended not on formal notions of territorial sovereignty, but rather on the practical question of ‘the exact extent and nature of the jurisdiction or dominion exercised in fact by the Crown.’” Rasul, 542 U.S. at 482, 124 S.Ct. 2686 (quoting Ex parte Mwenya, [1960] 1 Q.B. 241, 303 (C.A.) (Lord Evershed, M.R.)). We also know that the writ extended not only to citizens of the realm, but to aliens, see id. at 481 & n. 11, 124 S.Ct. 2686, even in wartime, see id. at 474-75, 124 S.Ct. 2686; Case of Three Spanish Sailors, 2 Black. W. 1324, 96 Eng. Rep. 775 (C.P.1779); Rex v. Schiever, 2 Burr. 765, 97 Eng. Rep. 551 (K.B.1759). A War of 1812-era case in which Chief Justice John Marshall granted a habeas writ to a British subject establishes that even conceded enemies of the United States could test in its courts detention that they claimed was unauthorized. See Gerald L. Neuman & Charles F. Hobson, John Marshall and the Enemy Alien: A Case Missing from the Canon, 9 GREEN Bag 2d 39 (2005) (reporting United States v. Williams (C.C.D.Va. Dec. 4,1813)).
To draw the ultimate conclusion as to whether the writ at common law would have extended to aliens under the control (if not within the sovereign territory) of the Crown requires piecing together the considerable circumstantial evidence, a step that the court is unwilling to take. Analysis of one of these cases, the 1759 English case of Rex v. Schiever, shows just how small this final inference is. Barnard Schiever was the subject of a neutral nation (Sweden), who was detained by the Crown when England was at war with France. Schiever, 2 Burr, at 765, 97 Eng. Rep. at 551. He claimed that his classification as a “prisoner of war” was factually inaccurate, because he “was desirous of entering into the service of the merchants of England” until he was seized on the high seas by a French privateer, which in turn was captured by the British Navy. Id. In an affidavit, he swore that his French captor “detained him[ ] against his will and inclination ... and treated him with so much severity! ] that [his captor] would not suffer him to go on shore when in port ... but closely confined him to duty [on board the ship].” Id. at 765-66, 97 Eng. Rep. at 551. The habeas court ultimately determined, on the basis of Schiever’s own testimony, that he was properly categorized and thus lawfully detained. Id. at 766, 97 Eng. Rep. at 551-52.
The court discounts Schiever because, after England captured the French privateer while en route to Norway, it was carried into Liverpool, England, where Schiever was held in the town jail. Id., 97 Eng. Rep. at 551. As such, the case did not involve “an alien outside the territory of the sovereign.” Op. at 988-89. However, Schiever surely was not voluntarily brought into England, so his mere presence conferred no additional rights. As the Supreme Court observed in Verdugo-Urquidez, “involuntary [presence] is not the sort to indicate any substantial connection with our country.” 494 U.S. at 271, 110 S.Ct. 1056. Any gap between Schiever *1002 and the detainees’ detention at Guantanamo Bay is thus exceedingly narrow.
This court need not make the final inference. It has already been made for us. In Rasul, the Supreme Court stated that “[application of the habeas statute to persons detained at the [Guantanamo] base is consistent with the historical reach of the writ of habeas corpus.” 542 U.S. at 481, 124 S.Ct. 2686. By reaching a contrary conclusion, the court ignores the settled principle that “carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative.” Sierra Club v. EPA, 322 F.3d 718, 724 (D.C.Cir.2003) (quoting United States v. Oakar, 111 F.3d 146, 153 (D.C.Cir.1997)) (internal quotation marks omitted). Even setting aside this principle, the court offers no convincing analysis to compel the contrary conclusion. The court makes three assertions: First, Lord Mansfield’s opinion in Rex v. Cowle, 2 Burr. 834, 97 Eng. Rep. 587 (K.B.1759), disavows the right claimed by the detainees. Second, it would have been impractical for English courts to extend the writ extraterritorially. Third, Johnson v. Eisentrager, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950), is controlling. None of these assertions withstands scrutiny.
In Cowle, Lord Mansfield wrote that “[t]here is no doubt as to the power of this Court; where the place is under the subjection of the Crown of England; the only question is, as to the propriety.” 2 Burr, at 856, 97 Eng. Rep. at 599. He noted thereafter, by way of qualification, that the writ would not extend “[t]o foreign dominions, which belong to a prince who succeeds to the throne of England.” Id., 97 Eng. Rep. at 599-600. Through the use of ellipsis marks, the court excises the qualification and concludes that the writ does not extend “[t]o foreign dominions.” Op. at 989. This masks two problems in its analysis. A “foreign dominion” is not a foreign country, as the court’s reasoning implies, but rather “a country which at some time formed part of the dominions of a foreign state or potentate, but which by conquest or cession has become a part of the dominions of the Crown of England.” Ex parte Brown, 5 B. & S. 280, 122 Eng. Rep. 835 (K.B.1864). And the exception noted in Lord Mansfield’s qualification has nothing to do with extraterritoriality: Instead, ha-beas from mainland courts was unnecessary for territories like Scotland that were controlled by princes in the line of succession because they had independent court systems. See William Blaciístone, 1 COMMENTARIES *95-98; James E. Pfander, The Limits of Habeas Jurisdiction and the Global War on Terror, 91 Cornell L. Rev. 497, 512-13 (2006). In the modern-day parallel, where a suitable alternative for habeas exists, the writ need not extend. See 2 Robert Chambers, A Course of Leo-TURES ON THE ENGLISH LAW DELIVERED AT Oxford 1767-1773, at 8 (Thomas M. Cur-ley, ed., 1986) (quoting Cowle as indicating that, notwithstanding the power to issue the writ “in Guernsey, Jersey, Minorca, or the plantations,” courts would not think it “proper to interpose” because “the most usual way is to complain to the king in Council, the supreme court of appeal from those provincial governments”); see also infra Part C.2. The relationship between England and principalities was the only instance where it was “found necessary to restrict the scope of the writ.” 9 William Holdsworth, A History of English Law 124 (1938). Cowle, by its plain language, then, must be read as recognizing that the writ of habeas corpus ran even to places that were “no part of the realm,” where the Crown’s other writs did not run, nor did its laws apply. 2 Burr, at 835-36, 853-55, 97 Eng. Rep. at 587-88, 598-99. The Supreme Court has adopted this logical reading. See Rasul, 542 U.S. at 481-82, 124 S.Ct. 2686; see also Mitchell B. Malachow- *1003 sM, From Gitmo with Love: Redefining Habeas Corpus Jurisdiction in the Wake of the Enemy Combatant Cases of 200k, 52 Naval L. Rev. 118,122-28 (2005).[7]
The court next disposes of Cowle and the historical record by suggesting that the “power” to issue the writ acknowledged by Lord Mansfield can be explained by the Habeas Corpus Act of 1679, 31 Car. 2, c. 2. See Op. at 989. The Supreme Court has stated that the Habeas Corpus Act “enforces the common law,” Ex parte Watkins, 28 U.S. (3 Pet.) 193, 202, 7 L.Ed. 650 (1830), thus hardly suggesting that the “power” recognized by Lord Mansfield was statutory and not included within the 1789 scope of the common-law writ. To the extent that the court makes the curious argument that the Habeas Corpus Act would have made it too impractical to produce prisoners if applied extraterritorially because it imposed fines on jailers who did not quickly produce the body, Op. at 989-90, the court cites no precedent that suggests that “practical problems” eviscerate “the precious safeguard of personal liberty [for which] there is no higher duty than to maintain it unimpaired,” Bowen v. Johnston, 306 U.S. 19, 26, 59 S.Ct. 442, 83 L.Ed. 455 (1939). This line of reasoning employed by the court fails for two main reasons:
First, the Habeas Corpus Act of 1679 was expressly limited to those who “have beene committed for criminall or supposed criminall Matters.” 31 Car. 2, c. 2, § 1. Hence, the burden of expediency imposed by the Act could scarcely have prevented common-law courts from exercising habeas jurisdiction in non-criminal matters such as the petitions in these appeals. Statutory habeas in English courts did not extend to non-criminal detention until the Habeas Corpus Act of 1816, 56 Geo. 3, c. 100, although courts continued to exercise their common-law powers in the interim. See 2 ChambeRS, supra, at 11; 9 Holdsworth, supra, at 121.
Second, there is ample evidence that the writ did issue to faraway lands. In Ex parte Anderson, 3 El. & El. 487, 121 Eng. Rep. 525 (Q.B.1861), superseded by statute, 25 & 26 Viet., c. 20, § 1, the Court of Queen’s Bench exercised its common-law powers to issue a writ of habeas corpus to Quebec in Upper Canada after expressly acknowledging that it was “sensible of the inconvenience which may result from such a step.” Id. at 494-95, 121 Eng. Rep. at 527-28; see also Brown, 5 B. & S. 280, 122 Eng. Rep. 835 (issuing a -writ to the Isle of Man in the sea between England and Ireland). English common-law courts also recognized the power to issue habeas corpus in India, even to non-subjects, and did so notwithstanding competition from local courts, well before England recognized its sovereignty in India. See B.N. Pandey, The Introduction of English Law into *1004 India 112, 149, 151 (1967); see also Rex v. Mitter, Morton 210 (Sup.Ct., Calcutta 1781), reprinted in 1 The Indian Decisions (Old Series) 1008 (T.A. Venkasawmy Row ed., 1911); Rex v. Hastings, Morton 206, 208-09 (Sup.Ct., Calcutta 1775) (opinion of Chambers, J.), reprinted in 1 The Indian Decisions, supra, at 1005, 1007; id. at 209 (opinion of Impey, C.J.); Kal Raustiala, The Geography of Justice, 73 Foedham L. Rev. 2501, 2530 n.156 (2005).
Finally, the court reasons that Eisen-trager requires the conclusion that there is no constitutional right to habeas for those in the detainees’ posture. See Op. at 990-91. In Eisentrager, the detainees claimed that they were “entitled, as a constitutional right, to sue in some court of the United States for a writ of habeas corpus.” 339 U.S. at 777, 70 S.Ct. 936. Thus Eisentrager presented a far different question than confronts this court.[8] The detainees do not here contend that the Constitution accords them a positive right to the writ but rather that the Suspension Clause restricts Congress’s power to eliminate a preexisting statutory right. To answer that question does not entail looking to the extent of the detainees’ ties to the United States but rather requires understanding the scope of the writ of habeas corpus at common law in 1789. The court’s reliance on Eisen-trager is misplaced.
2.
This brings me to the question of whether, absent the writ, Congress has provided an adequate alternative procedure for challenging detention. If it so chooses, Congress may replace the privilege of habeas corpus with a commensurate procedure without overreaching its constitutional ambit. However, as the Supreme Court has cautioned, if a subject of Executive detention “were subject to any substantial procedural hurdles which ma[k]e his remedy ... less swift and imperative than federal habeas corpus, the gravest constitutional doubts would be engendered [under the Suspension Clause].” Sanders v. United States, 373 U.S. 1, 14, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963).
The Supreme Court has, on three occasions, found a replacement to habeas corpus to be adequate. In United States v. Hayman, 342 U.S. 205, 72 S.Ct. 263, 96 L.Ed. 232 (1952), the Court reviewed 42 U.S.C. § 2255, which extinguished the writ as to those convicted of federal crimes before Article III judges in exchange for recourse before the sentencing court. Pri- or to the enactment of section 2255, the writ was available in the jurisdiction of detention, not the jurisdiction of conviction. The Court concluded that this substitute was acceptable in part because the traditional habeas remedy remained available by statute where section 2255 proved “inadequate or ineffective.” Id. at 223, 72 S.Ct. 263. The Court came to a similar conclusion in Swain v. Pressley, 430 U.S. 372, 97 S.Ct. 1224, 51 L.Ed.2d 411 (1977), reviewing a statute with a similar “inadequate or ineffective” escape hatch, id. at 381, 97 S.Ct. 1224 (reviewing D.C. CODE § 23-110). In that case, the Court concluded that a procedure for hearing habeas in the District of Columbia’s courts, as distinct from the federal courts, was an adequate alternative. Finally, in Felker, 518 U.S. at 663-64, 116 S.Ct. 2333, the Court found no Suspension Clause violation in the restrictions on successive petitions for the writ under the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1217, concluding that these were “well within the compass of [the] evolutionary process” of *1005 the habeas corpus protocol for abuse of the writ and did not impose upon the writ itself.
These cases provide little cover for the government. As the Supreme Court has stated, “[a]t its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest.” St. Cyr, 533 U.S. at 301, 121 S.Ct. 2271. With this in mind, the government is mistaken in contending that the combatant status review tribunals (“CSRTs”) established by the DTA suitably test the legitimacy of Executive detention. Far from merely adjusting the mechanism for vindicating the habeas right, the DTA imposes a series of hurdles while saddling each Guantanamo detainee with an assortment of handicaps that make the obstacles insurmountable.
At the core of the Great Writ is the ability to “inquire into illegal detention with a view to an order releasing the petitioner.” Preiser v. Rodriguez, 411 U.S. 475, 484, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) (internal quotation marks and alteration omitted). An examination of the CSRT procedure and this court’s CSRT review powers reveals that these alternatives are neither adequate to test whether detention is unlawful nor directed toward releasing those who are unlawfully held.
“Petitioners in habeas corpus proceedings ... are entitled to careful consideration and plenary processing of their claims including full opportunity for the presentation of the relevant facts.” Harris v. Nelson, 394 U.S. 286, 298, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969). The offerings of CSRTs fall far short of this mark. Under the common law, when a detainee files a habeas petition, the burden shifts to the government to justify the detention in its return of the writ. When not facing an imminent trial,[9] the detainee then must be afforded an opportunity to traverse the writ, explaining why the grounds for detention are inadequate in fact or in law. See, e.g., 28 U.S.C. §§ 2243, 2248; Bollman, 8 U.S. (4 Cranch) at 125; Ex parte Beeching, 4 B. & C. 137, 107 Eng. Rep. 1010 (K.B.1825); Schiever, 2 Burr. 765, 97 Eng. Rep. 551; cf. Hamdi, 542 U.S. at 537-38, 124 S.Ct. 2633 (plurality opinion). A CSRT works quite differently. See Order Establishing Combatant Status Review Tribunal (July 7, 2004), available at http://www.defenselink.mi1/news/Jul2004/d 20040707review.pdf. The detainee bears the burden of coming forward with evidence explaining why he should not be detained. The detainee need not be informed of the basis for his detention (which may be classified), need not be allowed to introduce rebuttal evidence (which is sometimes deemed by the CSRT too impractical to acquire), and must proceed without the benefit of his own counsel.[10] Moreover, these proceedings occur before a board of military judges subject to command influence, see Hamdan, 126 *1006 S.Ct. at 2804, 2806 (Kennedy, J., concurring in part); Weiss v. United States, 510 U.S. 163, 179-80, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994); cf. 10 U.S.C. § 837(a). Insofar as each of these practices impedes the process of determining the true facts underlying the lawfulness of the challenged detention, they are inimical to the nature of habeas review.
This court’s review of CSRT determinations, see DTA § 1005(e)(2), 119 Stat. at 2742, is not designed to cure these inadequacies. This court may review only the record developed by the CSRT to assess whether the CSRT has complied with its own standards. Because a detainee still has no means to present evidence rebutting the government’s case — even assuming the detainee could learn of its contents — assessing whether the government has more evidence in its favor than the detainee is hardly the proper antidote. The fact that this court also may consider whether the CSRT process “is consistent with the Constitution and laws of the United States,” DTA § 1005(e)(2)(C)(ii), 119 Stat. at 2742, does not obviate the need for habeas. Whereas a cognizable constitutional, statutory, or treaty violation could defeat the lawfulness of the government’s cause for detention, the writ issues whenever the Executive lacks a lawful justification for continued detention. The provisions of DTA § 1005(e)(2) cannot be reconciled with the purpose of habeas corpus, as they handcuff attempts to combat “the great engines of judicial despotism,” The FEDERALIST No. 83, at 456 (Alexander Hamilton) (E.H. Scott ed. 1898).
Additionally, and more significant still, continued detention may be justified by a CSRT on the basis of evidence resulting from torture. Testimony procured by coercion is notoriously unreliable and unspeakably inhumane. See generally INTELLIGENCE SCIENCE Board, Eduoing Information: Interrogation: Science and Art (2006), available at http://www.fas.orgdrp/ dni/educing.pdf. This basic point has long been recognized by the common law, which “has regarded torture and its fruits with abhorrence for over 500 years.” A. v. Sec’y of State, [2006] 2 A.C. 221 ¶ 51 (H.L.) (appeal taken from Eng.) (Bingham, L.); see also Hamdan, 126 S.Ct. at 2786; Jackson v. Denno, 378 U.S. 368, 386, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); Proceedings Against Felton, 3 Howell’s St. Tr. 367, 371 (1628) (Eng.); John H. Langbein, Torture and the Law of Proof 73 (1977) (“Already in the fifteenth and sixteenth centuries, ... the celebrated Renaissance ‘panegyr-ists’ of English law were ... extolling the absence of torture in England.”) (footnote omitted). The DTA implicitly endorses holding detainees on the basis of such evidence by including an anti-torture provision that applies only to future CSRTs. DTA § 1005(b)(2), 119 Stat. at 2741. Even for these future proceedings, however, the Secretary of Defense is required only to develop procedures to assess whether evidence obtained by torture is probative, not to require its exclusion. Id. § 1005(b)(1), 119 Stat. at 2741.
Even if the CSRT protocol were capable of assessing whether a detainee was unlawfully held and entitled to be released, it is not an adequate substitute for the habe-as writ because this remedy is not guaranteed. Upon concluding that detention is unjustified, a habeas court “can only direct [the prisoner] to be discharged.” Bollman, 8 U.S. (4 Cranch) at 136; see also 2 Story, supra, § 1339. But neither the DTA nor the MCA require this, and a recent report studying CSRT records shows that when at least three detainees were found by CSRTs not to be enemy combatants, they were subjected to a second, and in one case a third, CSRT proceeding until they were finally found to be properly classified as enemy combatants. Mark Denbeaux et al., No-Hearing Hear *1007 ings: CSRT: The Modem Habeas Corpus?, at 37-39 (2006), http://law.shu.edu/ news/fmal_no_hearing_hearings_xeport. pdf.
3.
Therefore, because Congress in enacting the MCA has revoked the privilege of the writ of habeas corpus where it would have issued under the common law in 1789, without providing an adequate alternative, the MCA is void unless Congress’s action fits within the exception in the Suspension Clause: Congress may suspend the writ “when in Cases of Rebellion or Invasion the public Safety may require it.” U.S. Const, art. I, § 9, cl. 2. However, Congress has not invoked this power.
Suspension has been an exceedingly rare event in the history of the United States. On only four occasions has Congress seen fit to suspend the writ. These examples follow a clear pattern: Each suspension has made specific reference to a state of “Rebellion” or “Invasion” and each suspension was limited to the duration of that necessity. In 1863, recognizing “the present rebellion,” Congress authorized President Lincoln during the Civil War “whenever, in his judgment, the public safety may require it, ... to suspend the writ of habeas corpus.” Act of Mar. 3, 1863, ch. 81, § 1, 12 Stat. 755, 755. As a result, no writ was to issue “so long as said suspension by the President shall remain in force, and said rebellion continue.” Id. In the Ku Klux Klan Act of 1871, Congress agreed to authorize suspension whenever “the unlawful combinations named [in the statute] shall be organized and armed, and so numerous and powerful as to be able, by violence, to either overthrow or set at defiance the constituted authorities of such State, and of the United States within such State,” finding that these circumstances “shall be deemed a rebellion against the government of the United States.” Act of Apr. 20, 1871, ch. 22, § 4, 17 Stat. 13, 14-15. Suspension was also authorized “when in cases of rebellion, insurrection, or invasion the public safety may require it” in two territories of the United States: the Philippines, Act of July 1, 1902, ch. 1369, § 5, 32 Stat. 691, 692, and Hawaii, Hawaiian Organic Act, ch. 339, § 67, 31 Stat. 141, 153 (1900); see Duncan v. Kahanamoku, 327 U.S. 304, 307-08, 66 S.Ct. 606, 90 L.Ed. 688 (1946). See also Duker, supra, at 149, 178 n. 190.
Because the MCA contains neither of these hallmarks of suspension, and because there is no indication that Congress sought to avail itself of the exception in the Suspension Clause, its attempt to revoke federal jurisdiction that the Supreme Court held to exist exceeds the powers of Congress. The MCA therefore has no effect on the jurisdiction of the federal courts to consider these petitions and their related appeals.
II.
In In re Guantanamo Detainee Cases, 355 F.Supp.2d 443 (D.D.C.2005), Judge Joyce Hens Green addressed eleven coordinated habeas cases involving 56 aliens being detained by the United States as “enemy combatants” at Guantanamo Bay, id. at 445. These detainees are citizens of friendly nations — Australia, Bahrain, Canada, Kuwait, Libya, Turkey, the United Kingdom, and Yemen' — -who were seized in Afghanistan, Bosnia and Herzegovina, The Gambia, Pakistan, Thailand, and Zambia. Each detainee maintains that he was wrongly classified as an “enemy combatant.” Denying in part the government’s motion to dismiss the petitions, the district court ruled:
[T]he petitioners have stated valid claims under the Fifth Amendment to the United States Constitution and ... the procedures implemented by the government to confirm that the petitioners *1008 are “enemy combatants” subject to indefinite detention violate the petitioners’ rights to due process of law.
Id. at 445. The district court further ruled that the Taliban but not the al Qaeda detainees were entitled to the protections of the Third and Fourth Geneva Conventions. Id. at 478-80.
In Khalid v. Bush, 355 F.Supp.2d 311 (D.D.C.2005), Judge Richard J. Leon considered the habeas petitions of five Algerian-Bosnian citizens and one Algerian citizen with permanent Bosnian residency. They were arrested by Bosnian police in 2001 on suspicion of plotting to attack the United States and British embassies in Sarajevo. After the Supreme Court of the Federation of Bosnia and Herzegovina ordered the six men to be released in January 2002,[11] they were seized by United States forces and transported to Guantanamo Bay. The Khalid decision also covers the separate case of a French citizen seized in Pakistan and transported to Guantanamo Bay. Rejecting the petitioners’ claim that their detention is unjustified, the district court ruled that “no viable legal theory exists by which [the district court] could issue a writ of habeas corpus under” the circumstances presented, id. at 314, noting the President’s powers under Article II, Congress’s Authorization for the Use of Military Force (“AUMF”), and the Order on Detention (Nov. 13, 2001), see id. at 317-20. The district court granted the government’s motion and dismissed the petitions. Id. at 316.
The fundamental question presented by a petition for a writ of habeas corpus is whether Executive detention is lawful. A far more difficult question is what serves to justify Executive detention under the law. At the margin, the precise constitutional bounds of Executive authority are unclear, see Hamdan, 126 S.Ct. at 2773-74; id. at 2786 (citing Ex parte Quirin, 317 U.S. 1, 28, 63 S.Ct. 1, 87 L.Ed. 3 (1942)), and the Executive detention at issue is the product of a unique situation in our history. Unlike the uniformed combat that is contemplated by the laws of war, see generally William Winthrop, MilitaRY Law AND Preoedents (2d ed.1920), the Geneva Conventions, e.g., Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135, and the Constitution, see U.S. Const, art. I, § 8, cl. 11, the United States confronts a stateless enemy in the war on terror that is difficult to identify and widely dispersed. See Hamdi, 542 U.S. at 519-20, 124 S.Ct. 2633.
The parties recite in their several briefs the substantial competing interests of individual liberty and national security that are at stake, much as did the Supreme Court in Hamdi 542 U.S. at 529-32, 124 S.Ct. 2633 (plurality opinion); see id. at 544-45, 124 S.Ct. 2633 (Souter, J., joined by Ginsburg, J., concurring in part, dissenting in part, and concurring in the judgment). In Hamdi, the plurality acknowledged that “core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them.” Id. at 531, 124 S.Ct. 2633. At the same time, it acknowledged that for Hamdi “detention could last for the rest of his life.” Id. at 520, 124 S.Ct. 2633. Although Hamdi was a United States citizen, the premise underlying the conclusion that there is a role for the judiciary, id. at 532-33, 124 S.Ct. 2633, was that “history and common sense teach us that an unchecked system of detention carries the potential to become a means for oppression and abuse of others who do *1009 not present that sort of threat,” id. at 530, 124 S.Ct. 2633. In short, the nature of the conflict makes true enemies of the United States more troublesome. At the same time, the risk of wrongful detention of mere bystanders is acute, particularly where, as here, the Executive detains individuals without trial.
Parsing the role of the judiciary in this context is arduous. The power of the President is at its zenith, after all, when the President acts in the conduct of foreign affairs with the support of Congress. See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635-38, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). Even assuming the AUMF and the Order on Detention provide such support for the detentions at issue, still the President’s powers are not unlimited in wartime. See, e.g., Milligan, 71 U.S. (4 Wall.) at 125. The Founders could have granted plenary power to the President to confront emergency situations, but they did not; they could have authorized the suspension of habeas corpus during any state of war, but they limited suspension to cases of “Rebellion or Invasion.” U.S. Const, art. I, § 9, cl. 2; see 2 Stoey, supra, § 1342; see also 2 The Reoords of the FedeRal Convention of 1787, stipra, at 341 (proposal of Charles Pinckney). Even in 1627, at a time when “[a]ll justice still flowed from the king [and] the courts merely dispensed that justice,” Duxee, supra, at 44, the idea that a court would remand a prisoner merely because the Crown so ordered {“per speciale mandatum Domini Regis ”) was deemed to be inconsistent with the notion of a government under law. See Darnel’s Case, 3 Howell’s St. Tr. 1, 59 (K.B.1627); Meadoe, supra, at 13-19. While judgments of military necessity are entitled to deference by the courts and while temporary custody during wartime may be justified in order properly to process those who have been captured, the Executive has had ample opportunity during the past five years during which the detainees have been held at Guantanamo Bay to determine who is being held and for what reason. See, e.g., Hamdan, 126 S.Ct. at 2773; cf. Hamdi, 542 U.S. at 521, 124 S.Ct. 2633.
Throughout history, courts reviewing the Executive detention of prisoners have engaged in searching factual review of the Executive’s claims. In Bollman, the Supreme Court reviewed a petition of two alleged traitors accused of levying war against the United States. The petitioners were held in custody by the marshal but had not yet been charged. 8 U.S. (4 Cranch) at 75-76,125. After the “testimony on which they were committed [was] fully examined and attentively considered,” the Court ordered the prisoners released. Id. at 136-37. The 1759 English case of Rex v. Schiever, discussed supra Part I.C.l, also shows that habeas courts scrutinized the factual basis for the detention of even wartime prisoners. In Schiever, the court reviewed the prisoner’s affidavit and took further testimony from a witness, who “sw[ore] that Schiever was forced against his inclination ... to serve on board [the French privateer].” 2 Burr, at 766, 97 Eng. Rep. at 551. Nonetheless, to the court it was clear that Schiever had, in fact, fought against England. As such, “the Court thought this man, upon his own shewing, clearly a prisoner of war and lawfully detained as such. Therefore they Denied the motion.” Id., 97 Eng. Rep. at 552 (footnote omitted). Similar themes and factual inquiry appear in Three Spanish Sailors, 2 Black. W. 1324, 96 Eng. Rep. 775, in which three alien petitioners submitted affidavits during wartime but failed to convince the court that they were not enemies of the Crown, and Gold-sivain’s Case, 5 Black. W. 1207, 96 Eng. Rep. 711 (C.P.1778), in which a wrongly impressed Englishman was released from service during wartime. See also Beeching, 4 B. & C. 137, 107 Eng. Rep. 1010.
*1010 In the early history of the United States, two cases further suggest that factual review accompanied even writs during wartime. In United States v. Williams (C.C.D.Va. Dec. 4, 1813), a previously unreported case researched for a recent essay in The Green Bag, Chief Justice John Marshall, riding circuit, released an enemy alien from detention by civil authorities. The Chief Justice concluded that “the regulations made by the President of the United States respecting alien enemies [did] not authorize the confinement of the petitioner in this case.” Neuman & Hobson, supra, at 42 (quoting the circuit court’s order book). A majority of the Supreme Court of Pennsylvania, in Lock-ington’s Case, 1 Brightly’s (N.P.) 269 (Pa. 1813), agreed that alien enemies were entitled to a judgment on the merits as to whether their detention was justified,[12] and thereafter remanded the prisoners. Id. at 283-84 (Tilghman, C.J.); id. at 285, 293 (Yeates, J.).
The government maintains that a series of World War II-era cases undercuts the proposition that habeas review of uncharged detainees requires a factual assessment. It cites several cases in which courts have refused to engage in factual review of the findings of military tribunals imposing sentences under the laws of war. See, e.g., Eisentrager, 339 U.S. 763, 70 S.Ct. 936; In re Yamashita, 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499 (1946); Quinn, 317 U.S. at 25, 63 S.Ct. 2. There is good reason to treat differently a petition by an uncharged detainee — who could be held indefinitely without even the prospect of a trial or meaningful process — from that of a convicted war criminal. See Rasul, 542 U.S. at 476, 124 S.Ct. 2686; Omar v. Harvey, 479 F.3d 1, 8 (D.C.Cir.2007); see also supra note 9. For example, in Yamashita, the prisoner petitioned for a writ of habeas corpus only after a trial before a military tribunal where his six attorneys defended against 286 government witnesses. 327 U.S. at 5, 66 S.Ct. 340. Quirin involved a military commission, see 317 U.S. at 18-19, 63 S.Ct. 2, where the government presented “overwhelming” proof that included confessions from the German saboteurs. PieRce O’DonNell, In Time of WAR 152-53, 165-66, 189 (2005). In Eisentrager, 339 U.S. at 766, 70 S.Ct. 936, the military tribunal conducted a trial lasting months. By contrast, the detainees have been charged with no crimes, nor are charges pending. The robustness of the review they have received to date differs by orders of magnitude from that of the military tribunal cases.[13]
*1011 The Supreme Court in Rasul did not address “whether and what further proceedings may become necessary after respondents make their responses to the merits of petitioners’ claims,” 542 U.S. at 485, 124 S.Ct. 2686. The detainees cannot rest on due process under the Fifth Amendment. Although the district court in Guantanamo Detainee Cases, 355 F.Supp.2d at 454, made a contrary ruling, the Supreme Court in Eisentrager held that the Constitution does not afford rights to aliens in this context. 339 U.S. at 770, 70 S.Ct. 936; accord Verdugo-Urquidez, 494 U.S. at 269, 110 S.Ct. 1056. Although in Rasul the Court cast doubt on the continuing vitality of Eisentrager, 542 U.S. at 475-79, 124 S.Ct. 2686, absent an explicit statement by the Court that it intended to overrule Eisentrager’s constitutional holding, that holding is binding on this court. See Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); Op. at 992. Rather, the process that is due inheres in the nature of the writ and the inquiry it entails. The Court in Rasul held that federal court jurisdiction under 28 U.S.C. § 2241 is permitted for habeas petitions filed by detainees at Guantanamo, 542 U.S. at 485, 124 S.Ct. 2686; id. at 488,124 S.Ct. 2686 (Kennedy, J., concurring in the judgment), and this result is undisturbed because the MCA is void. So long as the Executive can convince an independent Article III habeas judge that it has not acted unlawfully, it may continue to detain those allen enemy combatants who pose a continuing threat during the active engagement of the United States in the war on terror. See id. at 488, 124 S.Ct. 2686 (Kennedy, J., concurring in the judgment); cf. Hamdi 542 U.S. at 518-19, 124 S.Ct. 2633. But it must make that showing and the detainees must be allowed a meaningful opportunity to respond. See Meador, supra, at 18; see also Hamdi, 542 U.S. at 525-26, 124 S.Ct. 2633.
Therefore, I would hold that on remand the district courts shall follow the return and traverse procedures of 28 U.S.C. § 2241 et seq. In particular, upon application for a writ of habeas corpus, 28 U.S.C. § 2242, the district court shall issue an order to show cause, whereupon “[t]he person to whom the writ is or order is directed shall make a return certifying the true cause of the detention,” id. § 2243. So long as the government “puts forth credible evidence that the [detainee] meets the enemy-combatant criteria,” Hamdi, 542 U.S. at 533, 124 S.Ct. 2633, the district court must accept the return as true “if not traversed” by the person detained. Id. § 2248. The district court may take evidence “orally or by deposition, or, in the discretion of the judge, by affidavit.” Id. § 2246. The district court may conduct discovery. See Harris, 394 U.S. at 298-99, 89 S.Ct. 1082; cf. Rules Governing Section 2254 Cases, R. 6-8; Rules Governing Section 2255 Cases, R. 6-8. Thereafter, “[t]he [district] court shall summarily hear and determine the facts, and dispose of the matter as law and justice require.” [14] Dis *1012 trict courts are well able to adjust these proceedings in light of the government’s significant interests in guarding national security, as suggested in Guantanamo Detainee Cases, 355 F.Supp.2d at 467, by use of protective orders and ex parte and in camera review, id. at 471. The procedural mechanisms employed in that ease, see, e.g., id. at 452 & n. 12, should be employed again, as district courts must assure the basic fairness of the habeas proceedings, see generally id. at 468-78.
Accordingly, I respectfully dissent from the judgment vacating the district courts’ decisions and dismissing these appeals for lack of jurisdiction.

. The Suspension Clause is also distinct from the First Amendment, which has been interpreted as a guarantor of individual rights. See, e.g., United States v. Robel, 389 U.S. 258, 263, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); Gitlow v. New York, 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). The court cannot seriously maintain that the two provisions are alike while acknowledging that the First Amendment confers an individual right enforceable by the courts and simultaneously claiming that the Suspension Clause does not, see Op. at 988 n. 5 (citing Bollman, 8 U.S. (4 Cranch) at 95); see also In re Barry, 136 U.S. 597, 42 F. 113, 122, 34 L.Ed. 503 (C.C.S.D.N.Y.1844), error dismissed sub nom. Barry v. Mercein, 46 U.S. 103, 5 How. 103, 12 L.Ed. 70 (1847) ("The ninth section of the first article of the constitution, par. 2, declaring that 'the privilege of the writ of habeas corpus shall not be suspended unless, when in cases of rebellion or invasion, the public safety may require it,[1] does not purport to convey power or jurisdiction to the judiciary. It is in restraint of executive and legislative powers, and no further affects the judiciary than to impose on them the necessity, if the privilege of habeas corpus is suspended by any authority, to decide whether the exigency demanded by the constitution exists to sanction the act.”).

. Suspensions and bills of attainder have a shared history. In England, suspensions occasionally named specific individuals and therefore amounted to bills of attainder. See Rex A. Collings, Jr., Habeas Corpus for Convicts — Constitutional Right or Legislative Grace?, 40 Cal. L. Rev. 335, 339 (1952).

. The court cites a number of cases for the proposition that the Attainder Clause confers an individual right instead of operating as a structural limitation on Congress. See Op. at 993 n. 13. None of these cases makes the court’s point. In South Carolina v. Katzen-bach, 383 U.S. 301, 323-24, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), the Supreme Court held that it is not a bill of attainder for Congress to punish a state. This speaks to the definition of a bill of attainder and says nothing about the operation of the Attainder Clause. Weaver v. Graham, 450 U.S. 24, 30, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981), says the opposite of what the court asserts. In Weaver, the Supreme Court emphasized that the Ex Post Facto Clause is not intended to protect individual rights but governs the operation of government institutions:
The presence or absence of an affirmative, enforceable right is not relevant, however, to the ex post facto prohibition, which forbids the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred. Critical to relief under the Ex Post Facto Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated. Thus, even if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the Clause if it is both retrospective and more onerous than the law in effect on the date of the offense.
The Court also emphasized the structural nature of the limitations of Article I, section 9, in Nixon v. Adm’r of Gen. Servs., 433 U.S. 425, 469, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (noting that "the Bill of Attainder Clause [is] ... one of the organizing principles of our system of government”). Unsurprisingly, the court cites no authority that would support its novel construction of section 9 by providing that certain individuals lack Attainder Clause or Ex Post Facto Clause rights.

. For this point, the court quotes, without context, from H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949), see Op. at 993. In that case, the Supreme Court emphasized that the Bill of Rights limited the powers of Congress and did not affect the powers of the individual states, H.P. Hood & Sons, 336 U.S. at 534, 69 S.Ct. 657, at least until certain amendments were incorporated after ratification of the Fourteenth Amendment. This says nothing about the distinction, relevant here, between individual rights and limitations on Congress.

. It is unnecessary to resolve the question of whether the Constitution provides for an affirmative right to habeas corpus — either through the Suspension Clause, the Fifth Amendment guarantee of due process, or the Sixth Amendment' — or presumed the continued vitality of this "writ antecedent to statute," Williams v. Kaiser, 323 U.S. 471, 484 n. 2, 65 S.Ct. 363, 89 L.Ed. 398 (1945) (internal quotation marks omitted). Because the Supreme Court in Rasul held that the writ existed in 2004 and that there was, therefore, something to suspend, it is sufficient to assess whether the writ sought here existed in 1789. Given my conclusion, see infra Part C. 1, it is also unnecessary to resolve the question of whether the Suspension Clause protects the writ of habeas corpus as it has developed since 1789. Compare St. Cyr, 533 U.S. at 304-05, 121 S.Ct. 2271, and LaGueire v. Reno, 164 F.3d 1035, 1038 (7th Cir.1998), with Felker, 518 U.S. at 663-64, 116 S.Ct. 2333, and Gerald L. Neuman, Habeas Corpus, Executive Detention, and the Removal of Aliens, 98 Colum L. Rev. 961, 970 (1998). The court oddly chooses to ignore the issue by truncating its reference to St. Cyr, without comment, and omitting the qualifier "at the absolute minimum.” See Op. at 988.

. The court’s assertion that "extraterritorial detention was not unknown in Eighteenth Century England,” Op. at 990 n. 9, is of no moment. The court references the 1667 impeachment of the Earl of Clarendon, Lord High Chancellor of England. See id. at 989, 990 n. 9. Clarendon was accused of sending enemies to faraway lands to deprive them of effective legal process. The court makes the unsupported inference that habeas corpus was therefore unavailable abroad. Nothing in the Clarendon affair suggests that habeas corpus was sought and refused. Instead, as remains the case today, legal process can be evaded when prisoners are detained without access to the courts. That the detainees at Guantanamo were able to procure next friends and attorneys to pursue their petitions *1001 whereas seventeenth-century Englishmen would have found this difficult, if not impossible, says nothing about the availability of the writ at common law. The court's obfuscation as to the distinction between impracticality and unavailability is further addressed infra.

. The significance of a 1794 opinion by the U.S. Attorney General, see Op. at 989, which expresses the view that the writ should issue to the foreign commander of a foreign ship-of-war in U.S. ports, reasoning that the foreign ship has "no exemption from the jurisdiction of the country into which he comes,” 1 Op. Att'y Gen. 47 (1794), is unclear. Nor is it clear what point the court is making by referencing In re Ning Yi-Ching, 56 T.L.R. 3 (K.B. Vacation Ct.1939). In Rasul, the Supreme Court noted that Ning Yi-Ching "made quite clear that ‘the remedy of habeas corpus was not confined to British subjects,’ but would extend to 'any person ... detained' within the reach of the writ,” 542 U.S. at 483 n. 13, 124 S.Ct. 2686 (quoting Ning Yi-Ching, 56 T.L.R. at 5), and that the case does not support a "narrow view of the territorial reach of the writ,” id. Here, the court provides a parenthetical quotation for Ning Yi-Ching that recalls a dissenting position from a prior case that was later repudiated. See Rasul, 542 U.S. at 483 n. 14, 124 S.Ct. 2686; Mwenya, [1960] 1 Q.B. at 295 (Lord Evershed, M.R.).

. To the extent that the court relies on Eisen-trager as proof of its historical theory, the Supreme Court rejected that approach in Ra-sul, see 542 U.S. at 475-79, 124 S.Ct. 2686.

. At common law, where criminal charges were pending, a prisoner filing a habeas writ would be remanded, although habeas incorporated a speedy-trial guarantee. See, e.g., Ex parte Beeching, 4 B. & C. 137, 107 Eng. Rep. 1010 (K.B.1825); BusheU’s Case, Vaugh. 135, 124 Eng. Rep. 1006, 1009-10 (C.P.1670). But see MCA § 3(a)(1), 120 Stat. at 2602 (codified at 10 U.S.C. § 948b(d)(A)). Once there was “a judgment of conviction rendered by a court of general criminal jurisdiction,” release under the writ was unavailable. Hay-man, 342 U.S. at 210-11, 72 S.Ct. 263.

. With a few possible exceptions, the Guantanamo detainees before the federal courts are unlikely to be fluent in English or to be familiar with legal procedures and, as their detentions far from home and cut off from their families have been lengthy, they are likely ill prepared to be able to obtain evidence to support their claims that they are not enemies of the United States.

. See Supreme Court of the Federation of Bosnia and Herzegovina, Sarajevo, Jan. 17, 2003, Ki-1001/01.

. Prior to Ableman v. Booth, 62 U.S. (21 How.) 506, 16 L.Ed. 169 (1859), and Tarble’s Case, 80 U.S. (13 Wall.) 397, 411-12, 20 L.Ed. 597 (1872), state courts regularly issued writs of habeas corpus as to federal prisoners.

. There is also good reason to distinguish between these detainees’ cases and parallel cases where detainees have been accorded prisoner-of-war status and the benefits of Army Regulation 190-8, which implements the Third Geneva Convention. These provisions contemplate the end of hostilities and prisoner exchanges, id. §§ 3-11, 3-13, and provide for more extensive process for determining the status of prisoners, id. § 1-6. The regulations further specify that:
Persons who have been determined by a competent tribunal not to be entitled to prisoner of war status may not be executed, imprisoned, or otherwise penalized without further proceedings to determine what acts they have committed and what penalty should be imposed. The record of every Tribunal proceeding resulting in a determination denying [Enemy Prisoner of War] status shall be reviewed for legal sufficiency when the record is received at the office of the Staff Judge Advocate for the convening authority.
Id. § l-6g. In Hamdi, the Supreme Court recognized that it was conceivable that procedures similar to Army Regulation 190-8 may suffice to provide due process to a citizen- *1011 detainee. 542 U.S. at 538, 124 S.Ct. 2633 (plurality opinion); id. at 550-51, 124 S.Ct. 2633 (Souter, J., with whom Ginsburg, J., joins, concurring in part, dissenting in part, and concurring in the judgment). Even assuming that according Guantanamo detainees rights under Army Regulation 190-8 would provide adequate and independent factual review of their claims sufficient to satisfy the dictates of habeas corpus, as well as any treaty obligations that the detainees are able to enforce, the Executive has declined to accord such detainees prisoner-of-war status, see, e.g., The President's News Conference With Chairman Hamid Karzai of the Afghan Interim Authority, 1 Pub. Papers 121, 123 (Jan. 28, 2002).

. Because the Suspension Clause question must be decided by the Supreme Court in the detainees’ favor in order for the district court proceedings to occur, I leave for another day questions relating to the evolving and unlimited definition of "enemy combatant,” see *1012 Guantanamo Detainee Cases, 355 F.Supp.2d at 474-75, a detainee’s inability to rebut evidence withheld on national security grounds, see id. at 468-72, as well as the detainees’ claims under other statutes, international conventions, and treaties, and whether challenges to the conditions of confinement are cognizable in habeas. Compare Khalid, 355 F.Supp.2d at 324-25, with Miller v. Overholser, 206 F.2d 415, 419-21 (D.C.Cir.1953). Congressional action may also clarify matters. See, e.g., S. 185, S. 576, 110th Cong. (2007).